696 F.2d 901
 Jane DOE, a minor, By and Through her father and next
friend, John DOE, and John Doe, individually,
Plaintiffs-Appellants,
v.
PUBLIC HEALTH TRUST OF DADE COUNTY d/b/a Jackson Memorial
Hospital, et al., Defendants-Appellees.
 No. 80-5963.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 24, 1983.
 
 Kathleen Phillips, Joel V. Lumer, William Ploss, Miami, Fla., for plaintiffs-appellants.
 Melinda Sterman Thornton, Asst. County Atty., Miami, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before VANCE, HATCHETT and ANDERSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 In his separate concurring opinion Judge Hatchett has sufficiently stated the factual and procedural background of this case and has correctly identified the standard of review. The panel majority, however, differs with Judge Hatchett on the central issues before us and their resolution.
 
 
 2
 Our concern is focused on the rights of the parties when a child is voluntarily hospitalized in a mental treatment facility, particularly with reference to the parents' rights of communication with the child and their right to supervise his or her treatment.
 
 
 3
 Our courts have addressed at some length the rights of persons involuntarily committed to mental hospitals. In the seminal case of Donaldson v. O'Connor, 493 F.2d 507 (5th Cir.1974), we held that such a person has a constitutional right to such individual treatment as will help him be cured or to improve his mental condition. Donaldson and the subsequent holding in Wyatt v. Aderholt, 503 F.2d 1305 (5th Cir.1974), established that the rights therein recognized could be implemented through judicially manageable standards. The requirement that the treatment be accomplished in the least restrictive setting was held in Gary W. v. State of La., 437 F.Supp. 1209 (E.D.La.1976) to be a convenient summary of the standard applicable to all governmental restrictions on fundamental personal liberties, as set forth in Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).
 
 
 4
 The Donaldson rationale is of key importance to our present inquiry. It began by noting that civil commitment or involuntary hospitalization entails a massive curtailment of liberty in a constitutional sense. Id., 493 F.2d at 520. From this beginning the Donaldson court reasoned that such curtailment is justified only by a patient's danger to himself and others or the patient's need for treatment. It concluded that fundamentals of due process were offended when treatment was not in fact provided.
 
 
 5
 The language of Shelton on which the court focused in Gary W. was as follows:
 
 
 6
 [E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in light of less drastic means for achieving the same basic purpose.
 
 
 7
 364 U.S. at 488, 81 S.Ct. at 252. Even so, the court was quick to point out that the imperative that the least drastic means be considered does not imply that every involuntary patient has a right to a personal judicial determination that his or her care and treatment were the best possible or the least restrictive conceivable. Gary W. v. State of La., 437 F.Supp. at 1217.
 
 
 8
 The Does argue that the least restrictive requirement is applicable in Jane Doe's case and was shown to have been violated under the alleged facts by the no-communication rule. They reason that limitations on the parents' communication with Jane must be measured by due process standards. The contention breaks down, however, when we focus on the voluntary nature of Jane Doe's hospitalization. Unlike the involuntary patient, the voluntary one has not been forced to suffer any massive curtailment of liberty. Curtailment of liberty in such case does not provide the quid pro quo requiring some corresponding duty on the part of those from whom he or she seeks treatment. The voluntary patient carries the key to the hospital's exit in her hand. She chooses to accept treatment or not accept it as a matter of the exercise of free will.
 
 
 9
 The Does assert that parents have the right to decide what medical attention should or should not be provided for their children. They argue that the right can be ignored only upon a showing of compelling state interest. They claim that their rights were violated when defendants did not obtain express and informed consent for specific treatment and medication. In our view the Does exercised their rights to decide what medical treatment should or should not be provided Jane when they decided voluntarily to admit her to Jackson Memorial Hospital. John Doe's rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself. The court's holding in Rogers v. Okin, 634 F.2d 650 (1st Cir.1980), when speaking of a contended right of a voluntary adult patient to refuse antipsychotic medication, is dispositive of the contention:
 
 
 10
 [T]he district court in effect found that Massachusetts citizens have a constitutional right upon voluntary admittance to state facilities to dictate to the hospital staff the treatment that they are given. The district court cited no authority for this finding, and we know of none. Massachusetts law provides for the voluntary admission of mental health patients who are "in need of care and treatment ... providing the admitting facility is suitable for such care and treatment." Mass.Gen.Laws Ann. ch. 123 Sec. 10(a). The statute does not guarantee voluntary patients the treatment of their choice. Instead, it offers a treatment regimen that state doctors and staff determine is best, and if the patient thinks otherwise, he can leave.[10] We can find nothing even arguably unconstitutional in such a statutory scheme.
 
 
 11
 Id. at 661.
 
 
 12
 The Does cite Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), and related cases for the proposition that the state may not deny a benefit to a person on a basis that infringes his constitutionally protected interests. They argue that the rights of family unity and of familial association are fundamental constitutional rights that they cannot be required to surrender as a condition to receiving the medical services provided by Dade County.
 
 
 13
 Judge Hatchett reasons that Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1974), implicitly recognizes a constitutional right of parents to communicate with a child committed to a state mental hospital else they could not exercise the rights and duties to act in the child's interest that Parham makes implicit. We assume that some such communication right exists. The majority feels, however, that our efforts to probe the depths and give definition to the murky boundaries of such a communication right are better left to a case involving record evidence and facts as found rather than on review of a motion to dismiss. For the present we differ with the conclusion that under all facts and circumstances restriction of such right constitutes a constitutional violation. In his concurring opinion in Parham Justice Stewart observed,
 
 
 14
 But not every loss of liberty is government deprivation of liberty, and it is only the latter that invokes the Due Process Clause of the Fourteenth Amendment.
 
 
 15
 Id. at 622, 99 S.Ct. at 2514. If the no-communication rule to which Jane Doe was subjected was in fact medically legitimate and therapeutic, Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), supports the conclusion that it is not constitutionally offensive. In Wyman a welfare recipient asserted a fourth amendment challenge to New York's right to require home visitation as a condition for receipt of the public payments. The dissent argued that Mrs. James could not be required to waive her constitutional immunity from search in order to receive the state benefit. 400 U.S. at 328-29, 91 S.Ct. at 391 (Douglas, J., dissenting); 400 U.S. at 344, 91 S.Ct. at 400 (Marshall and Brennan, JJ., dissenting). The majority held, however, that the home visit was at the "heart of welfare administration" and was part of the rehabilitative purpose of the program. The Court concluded that the search was reasonable. 400 U.S. at 318-24, 91 S.Ct. at 386-89. If the no-communication therapy in this case is medically legitimate and is part of the service or benefit being offered by the state, the restriction on communication is part and parcel of the benefit being bestowed. This being so, there would be no improper condition upon the state benefit.
 
 
 16
 We recognize, of course, that under our liberal rules of pleading a complaint should not be dismissed unless it appears that the plaintiff can prove no set of facts that would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). By their "test case" approach the Does have primarily focused the court's attention on their arguments addressing allegations that defendants violated their rights (1) that Jane Doe be provided treatment in the least restrictive environment, and (2) that defendants must not restrict rights of communication between parent and child and supervision of treatment. These arguments are presented in the context of voluntary patient status. Although we reject the arguments as asserted, they have obscured two claims that we conclude are arguably contained within the amended complaint.
 
 
 17
 The complaint alleged that Jane Doe entered the hospital as a voluntary patient. Subsequent allegations, however, may be construed to claim that her status became involuntary. Whether or not it became involuntary, because of force or deception, is a question of fact. In addition the Does contend that the no-communication rule is a mere pretext, utterly nontherapeutic and medically illegitimate.[1] If so, and if the benefits of the state provided medical services are conditioned upon a waiver of such right of communication, then the Does will have stated a valid cause of action. Because of these contentions the majority concludes that the district court erred in dismissing the Does' complaint.
 
 
 18
 To summarize: The panel majority rejects the contentions (1) that a voluntary, minor mental patient must be treated in the least restrictive environment, (2) that such patient and her parents have communication rights and rights to supervise the treatment which foreclose a bona fide therapeutic no-communication rule. We conclude, however, that the breadth of the Does' allegations, as argued here and in the district court, are sufficient to include claims (1) that their rights were violated because she was a de-facto involuntary patient and (2) that the no-communication rule is nontherapeutic and medically illegitimate and an improper condition upon a state benefit.
 
 
 19
 REVERSED AND REMANDED.
 
 
 20
 HATCHETT, Circuit Judge, specially concurring.
 
 
 21
 It overlooks reality to say, as the majority does, that a child admitted to a hospital by a parent is a voluntary patient and under the law, should be treated more like an adult voluntary patient than an adult involuntary patient. To hold, as the majority does, that the parents of a child have the right to seek medical treatment for the child and protect the child's interests without any knowledge or first hand observation of the treatment's progress is folly. Thus, while I agree to the reversal and remand of this case, I write separately to point out the illogical conclusions reached by the majority, and to accent the serious constitutional deprivation in this case.
 
 
 22
 John Doe, appellant, contends that the Public Health Trust of Dade County (Public Health Trust) abridged his constitutional right to supervise his hospitalized child by preventing him access to information concerning the well-being of the child and by prohibiting communications with the child. Because I find that the complaint alleges an impairment of John Doe's constitutional rights, I would hold that Doe's complaint presents a substantial federal question and that the allegations in the complaint state a claim upon which relief may be granted. I would therefore reverse the district court.
 
 I. BACKGROUND
 A. Facts
 
 23
 According to the amended complaint, John Doe voluntarily admitted his daughter, Jane, to Jackson Memorial Hospital's adolescent psychiatric unit on or about July 29, 1980. Upon her admittance, hospital authorities told Jane's parents (Does) that she would undergo a one-week evaluation period during which no communications would be permitted between them and their child. The parents consented to this seven-day no communications period. Following the intake period, the hospital's doctors met with Jane's parents to discuss Jane's evaluation process. Although the doctors never informed Jane's parents of the diagnosis arrived at by the intake team, the doctors assigned Jane to the adolescent unit under a therapy regimen that involved a "privilege" system. This therapy required Jane to earn all privileges, including the privilege to communicate with her parents in person or in writing. Jane's parents allege that the hospital misrepresented the nature of the privilege system and led them to believe that communications would be quickly reestablished.
 
 
 24
 After one month without any communication, Jane's parents began to pressure hospital administrators for some contact with Jane. Hospital officials rebuffed their efforts and refused to inform them of the diagnosis of Jane's mental condition. The anxiety was further heightened when Jane's parents discovered that the hospital was not treating Jane for a kidney ailment as requested. In addition, the parents learned that the hospital was treating Jane with medication, without parental consent, for a gynecological problem that hospital officials refused to explain. After efforts to regain contact with their daughter failed, the Does attempted to find a new treatment program for Jane. Because the therapy had lasted for more than two months, however, their insurance benefits, which paid for her treatment, were nearly exhausted. No other treatment facility would accept Jane because the insurance was no longer sufficient to guarantee completion of a therapy program.
 
 B. Procedural History
 
 25
 Pursuant to 42 U.S.C.A. Sec. 1983, John Doe filed his complaint on behalf of himself and Jane on September 17, 1980, seeking both declaratory and injunctive relief. He alleged deprivation of parental rights guaranteed by the first, fourth, fifth, ninth, and fourteenth amendments to the United States Constitution. In addition to the complaint, John Doe also filed a motion for a temporary restraining order to prevent the Public Health Trust from enforcing its prohibition of communication between parents and daughter. At an emergency hearing, finding no federally protected right under the circumstances of this case that would permit the court to exercise jurisdiction and direct the Public Health Trust to alter its treatment of Jane, the district court denied the motion. John Doe subsequently filed his amended complaint, motion for preliminary injunction, and memorandum of law in support of the view that a substantial federal question existed sufficient to supply the court with subject matter jurisdiction.
 
 
 26
 Pursuant to Fed.R.Civ.P. 12(b)(1) and (6), the Public Health Trust moved to dismiss the amended complaint contending that the district court lacked jurisdiction over the subject matter and that it failed to state a claim upon which relief could be granted. For the reasons set forth during the hearing on Doe's motion for a temporary restraining order, the district court granted the motion to dismiss.[1]
 
 
 27
 Despite the district court's reliance upon its "reasons" set forth during the hearing, my examination of that hearing's transcript leaves me uncertain as to the exact basis for the dismissal. I believe the district court concluded that subject matter jurisdiction was absent. The parties, however, consider the dismissal as predicated upon a failure to state a claim upon which relief could be granted. Because of the uncertainty and the possibility that the court based the dismissal on both grounds, the allegations of the amended complaint shall be compared against the standards justifying dismissal under Fed.R.Civ.P. 12(b)(1) and (6). Furthermore, because the district court dismissed the complaint for either lack of subject matter jurisdiction or failure to state a claim or both, Doe's allegations are regarded as true. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Dike v. School Board of Orange County, 650 F.2d 783, 784 (5th Cir.1981); Miller v. Stanmore, 636 F.2d 986, 988 (5th Cir.1981).
 
 
 28
 In dismissing the complaint, the district court recognized the constitutional right of a parent to speak with his child. The crucial question, according to the district court, was whether the Constitution provides any rights which obligate a federal court to mandate changes in a state hospital's treatment program. Believing that no such rights exist, the district court focused on the voluntary nature of Jane's commitment and her parents' ability to remove her from the therapy program at any time. The district court believed that voluntary commitment involves a relinquishment of certain rights when the exercise of those rights directly conflicts with the therapy being employed. Assuming that neither due process nor other constitutional safeguards apply to the voluntary commitment of a minor, the trial court deemed the treatment program's policy requiring Jane's parents to relinquish their right to communicate with their daughter a neutral condition reasonably related to the rendition of a state benefit.
 
 
 29
 John Doe contends that the Public Health Trust may not condition the receipt of services on the relinquishment of a constitutional right. He further asserts that the district court erred in presuming that the distinction between voluntary and involuntary patients was dispositive of the issue of whether a liberty interest of the parent had been violated. The Public Health Trust counters with the argument that because Jane Doe is a voluntary patient, she does not possess the constitutional rights of involuntarily institutionalized mental patients. The Public Health Trust further asserts that because Jane's parents have not suffered a violation of a federally protected interest, any cause of action that may exist must be pursued in state court.
 
 II. ISSUES
 
 30
 Initially, it must be decided (1) whether a parent has a constitutionally protected right to supervise the medical treatment of a minor child when the parent voluntarily admits the child to a state psychiatric facility; and (2) if the right exists, whether this right is violated when a state therapy program prohibits the exercise of parental supervision by foreclosing parental access to information concerning the child's well-being and by precluding communication between parent and child.
 
 
 31
 III. STANDARD OF REVIEW ON A MOTION TO DISMISS
 
 
 32
 I note at the outset the liberal construction that district courts must accord a plaintiff's complaint. For purposes of a motion to dismiss, the district court must liberally construe the material allegations in favor of the plaintiff. Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); Bracewell v. Nicholson Air Services, Inc., 680 F.2d 103, 104 (11th Cir.1982). The initial inquiry on review requires a determination of whether the district court had subject matter jurisdiction. In this regard, a liberal standard guides the trial court in determining whether the question is substantial enough to invoke federal jurisdiction. Davis v. Cluet, Peabody & Co., 667 F.2d 1371 (11th Cir.1982). A complaint should be dismissed only where the federal question is so "unsubstantial, implausible, foreclosed by prior decisions, or otherwise completely devoid in its merits as not to involve a federal controversy." Davis, 667 F.2d at 1372 (citing Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 666, 94 S.Ct. 772, 776, 39 L.Ed.2d 73 (1974)). With regard to a motion to dismiss for failure to state a claim, a section 1983 complaint should not be dismissed unless it appears that the plaintiff can prove no set of facts which would entitle him to relief. Richardson v. Fleming, 651 F.2d 366 (5th Cir.1981).
 
 
 33
 Doe's contention that this case presents a substantial federal question shall be addressed first.
 
 IV. THE EXISTENCE OF A CONSTITUTIONAL RIGHT
 
 34
 No federal court has squarely addressed whether parents possess a constitutional right to communicate with their children who are committed to a state mental health facility. In Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1974), however, the Supreme Court implicitly recognized the existence of this right in upholding Georgia's procedures for the "voluntary" commitment of minors to state mental hospitals. The Court held that, in view of (1) the liberty interest of the children in not being unnecessarily confined, (2) the rights and obligations of parents in acting for their child, (3) the state's obligation and interest regarding the operation of its mental health care facilities, and (4) the risk of error inherent in the commitment decision, due process did not require a formal or quasi-formal pre-confinement hearing on the propriety of commitment when parents seek to voluntarily admit their child. The Court held, rather, that due process requires only that a "neutral fact finder" conduct some kind of inquiry to determine whether statutory admission requirements are satisfied. Parham, 442 U.S. at 606, 99 S.Ct. at 2506. In upholding this procedure, however, the Court placed particular reliance on the fact that the procedure was coupled with the parents' presumed exercise of their right and duty to act in the best interests of their children. Parham, 442 U.S. at 602-03, 99 S.Ct. at 2504. While noting that the parental decision to commit their child is not absolute and unreviewable, the Court concluded that parents "retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply." Parham, 442 U.S. at 604, 99 S.Ct. at 2505.
 
 
 35
 Although the initial commitment of a psychiatric patient is constitutionally justified, confinement may continue only as long as that basis exists. O'Connor v. Donaldson, 422 U.S. 563, 574-75, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975). Thus, the Parham Court also recognized the necessity of reviewing the child's continuing need for commitment by an independent procedure. Parham, 442 U.S. at 607, 99 S.Ct. at 2506. The Court suggested that in the absence of a formal or quasi-formal hearing, both hospital oversight and continuing parental supervision are necessary safeguards against the risk of erroneous commitment of minors. Indeed, the Court emphasized the important role parents play in monitoring the propriety of continued hospitalization. In this regard, the Court stated:
 
 
 36
 The absence of an adult who cares deeply for a child has little effect on the reliability of the initial admission decision, but it may have some effect on how long a child will remain in the hospital. We noted in Addington v. Texas, 441 U.S. at 428-429, [99 S.Ct. 1804 at 1811, 60 L.Ed.2d 323], that "the concern of family and friends generally will provide continuous opportunities for an erroneous commitment to be corrected." For a child without natural parents, we must acknowledge the risk of being "lost in the shuffle."
 
 
 37
 Parham, 442 U.S. at 619, 99 S.Ct. at 2512. Because parental concern and supervision comprise a necessary safeguard against the wrongful initial and continued confinement of the child, Parham supports, in the absence of formal procedural protections, a constitutional right of continuing parental oversight.[2]
 
 
 38
 The significance of this right is magnified when the restrictions imposed by the treatment program are viewed from the child's perspective. John Doe's amended complaint also alleges a deprivation of Jane's first amendment rights of speech and association, as well as a deprivation of her liberty interests without due process of law. From Jane's perspective as a minor, her continued hospitalization closely resembles an involuntary commitment. As are most adolescents, she is simply incapable of making a rational judgment on the continuing need for medical attention. Thus, she must rely on her parents to make those decisions. See Parham, 442 U.S. at 603, 99 S.Ct. at 2504. Where the parent and child are unable to communicate in any manner, however, the parent is effectively prevented from making an informed decision on an important parental responsibility. It follows that an absolute restriction on parental access to information concerning the well-being of their institutionalized children, coupled with a prohibition against parent-child communication, renders ineffectual the right to assess the need for continued hospitalization.
 
 
 39
 In addition to the right of continual parental oversight which Parham recognizes, it is noted that the Supreme Court has consistently acknowledged the constitutional stature of the family, and of the parent-child relationship. Both are rooted within the due process and equal protection clauses of the fourteenth amendment and within the penumbral zone of privacy created by the ninth amendment in conjunction with several fundamental guarantees. See, e.g., Santosky v. Kramer, --- U.S. ----, ----, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982) (natural parents possess a fundamental liberty interest in the care, custody, and management of their child); Roe v. Wade, 410 U.S. 113, 152-53, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973) (constitutional right of privacy embraces activities related to marriage, procreation, contraception, family relationships, and child rearing and education). "It is cardinal with us that the custody, care, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). More recently, the Court stated:
 
 
 40
 "This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."
 
 
 41
 ....
 
 
 42
 Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in the Nation's history and tradition.
 
 
 43
 Moore v. East Cleveland, 431 U.S. 494, 499, 503, 97 S.Ct. 1932, 1935, 1937, 52 L.Ed.2d 531 (1977) (quoting Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974)).
 
 
 44
 A host of Supreme Court decisions have extended constitutional protection to freedom of choice with respect to child rearing. E.g., LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); Roe, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The Supreme Court has accorded constitutional protection to parental rights to custody and companionship of their own children, as well as traditional parental authority in matters of child rearing and education. Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The rationale underlying these precedents applies with equal force to the question of privacy and family autonomy implicated in this case. Indeed, in view of the important role of the family as a check against the wrongful commitment of minor children, it would be folly to recognize the aforementioned rights yet fail to afford any protection to the parental right to supervise their institutionalized children in the face of state proscriptions against parental access to information and against parent-child communication imposed for therapeutic reasons.
 
 
 45
 I therefore conclude that John Doe's allegation that he was deprived of his rights as a parent under the first, fourth, fifth, ninth, and fourteenth amendments presents a substantial federal question. Insofar as lack of subject matter jurisdiction may have been a basis on which the district court dismissed the amended complaint, the court's dismissal was erroneous.
 
 
 46
 V. DEPRIVATION OF THE RIGHT BY THE DEFENDANTS
 
 
 47
 Having recognized that the parental responsibility of supervision arising out of the interest in and obligation for the health and welfare of their children implicates the exercise of rights guaranteed by the Constitution, it must next be determined whether Doe has alleged a proper claim under 42 U.S.C.A. Sec. 1983. If a proper claim has been adequately alleged, it must further be decided whether the Public Health Trust's deprivation of these rights can withstand judicial scrutiny. To determine whether a sufficient claim has been set out under section 1983, the following three-step analysis is appropriate: (1) whether a person was deprived of a right, privilege, or immunity secured by the Constitution or the laws of the United States; (2) whether the defendant subjected the plaintiffs to the deprivation; and (3) whether the defendants acted under the color of state law. Adickes v. Kress Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).
 
 
 48
 Doe concedes that the hospital staff informed him that Jane would be incommunicado for a one-week period for the purpose of orienting her to the psychiatric ward. In describing the therapy regimen prescribed for Jane, however, staff told the Does only that the program would require Jane to earn "privileges" of communication. After approximately one month of confinement, Jane had earned no "privileges." Hospital staff denied the Does any access to their daughter by mail, telephone, or personal visitation, prevented Jane from initiating communication with her parents, and rebuffed numerous attempts by the parents to reestablish communication with their daughter. Significantly, Doe has also alleged that hospital personnel prevented his acquisition of information about his daughter's welfare and facts concerning the side effects of her treatment, treatment alternatives, or the approximate length of care. The Public Health Trust has thus precluded any informed consent by the parents, either express or implied, for any specific treatment, including the isolation therapy. Applying these allegations, which must be taken as true, to the analysis set out above, I conclude that John Doe has stated a proper claim.
 
 
 49
 As discussed earlier, parents have a protected right to supervision arising out of their interest in and obligation for the welfare and health of their children. Doe has alleged that the hospital officials eviscerated this right through the imposition of a treatment regimen which deprived him of his ability to obtain information concerning his daughter's health and to communicate with his child so as to meaningfully exercise the right. The Public Health Trust maintains in this appeal that Jane or her parents can, under Florida law, seek her discharge at any time. It must be decided, therefore, whether the parental right of supervision mandates communication between parent and child under the circumstances of this case. Further, it must be decided whether the reestablishment of communication can be achieved without removing Jane from the treatment facility. Because of the importance I attach to the fundamental right of parental supervision, I would hold that the Does must be allowed to communicate with their daughter without removing her from the institution. As discussed below, however, the act of communication carries with it certain consequences.
 
 
 50
 The therapeutic measure involved in the treatment program here under attack--no communication between parent and child--is unlike any medical therapy I can reasonably imagine in a practical setting. In most other instances, discovering whether a child is progressing from an illness, even mentally related, involves a parent's viewing and communicating with the child. In this case, however, the parents' right to supervise is prohibited by the very program undertaken to bring about a cure. Allowing John Doe to exercise his right of supervision over the medical treatment of his child in no way calls into question the professional judgment of the treating physician who recommended this therapy. Moreover, I explicitly refrain from questioning the medical legitimacy of the treatment program. The deference I give to the medical judgment involved, however, does not outweigh the right of the parent to analyze the progress gained by such a program. John Doe has evidenced his concern for the mental stability of his daughter by seeking medical treatment. With all respect due to the opinion of the treating physician, he can never be certain whether the therapy is resulting in improvement without first-hand observation. Such observation necessarily involves communication.
 
 
 51
 In recognizing John Doe's right to examine the effects of the treatment program, I do not intimate that a parent has a right to demand a treatment program of his choice. I would hold only that a parent, after initially consenting to a treatment program that requires foregoing certain rights, can later reject the program chosen and cannot be forced into a choice of either accepting continued deprivation of communication or removing his child from the institution.[3] Cf. Rogers v. Okin, 634 F.2d 650, 661 (1st Cir.1980),vacated on other grounds sub nom. Mills v. Rogers, --- U.S. ----, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982) (patients entitled to therapy that state doctors, in the exercise of their professional judgment, determine is best). Once the Does initiate communication, however, certain risks evolve. Obviously, the no communication therapy is rendered ineffectual and its success or failure to that point is irrelevant. When the no communication restriction is lifted, the parent cannot enforce a desire to continue treatment under the therapy previously employed. Moreover, if this particular treatment program is the only method practiced at this institution, or is the only program that doctors at Jackson Memorial will prescribe based on their professional judgment of the patient's individual needs, the parent can then only seek treatment elsewhere.
 
 
 52
 I cannot overemphasize that my position does not call into question the legitimacy of the no-communication rule of the therapy program. The results from such a program may result in complete recovery for its participants. Moreover, I do not question the soundness of the professional judgment behind the implementation of this type of treatment. Nevertheless, because the requirements of the therapy impinge upon the constitutional right which is recognized above, I would hold that the Public Health Trust cannot prevent John Doe from "violating" its proscriptions but, at the same time, cannot condition the exercise by requiring Jane's parents to withdraw their daughter from the treatment facility.
 
 VI. CONCLUSION
 
 53
 I believe that Doe's amended complaint sets forth sufficient allegations, which, if proven, would entitle him to relief under section 1983. Because the resolution of these allegations depends upon the presentation of evidence, which, at this stage of the proceedings has yet to occur, I would allow the parties to be heard more fully in further proceedings, either through summary judgment or trial on the merits. Scheuer v. Rhodes, 416 U.S. 232, 250, 94 S.Ct. 1683, 1693, 40 L.Ed.2d 90 (1974). If further proceedings reveal that such allegations cannot be substantiated, the district court would be obligated to dismiss. Such a determination, however, must be based upon the facts as developed. See Harper v. Cserr, 544 F.2d 1121, 1125 (1st Cir.1976). I would therefore reverse the district court's dismissal of Doe's complaint and remand to that court for further proceedings.
 
 
 
 [10]
 To the extent that patients might be prevented from leaving, they become involuntary patients whose rights are as set forth in the preceding parts of this opinion
 
 
 [1]
 Because the record now before us leaves us uncertain whether appellants will be able to show that the no-communication rule is medically illegitimate, regardless of the standard governing such showing, and because this issue has been inadequately briefed, we decline at this time to reach out and define precisely what showing the Does must make to prove a valid cause of action. If the issue is reached upon remand, we suggest two possibilities that should be considered by the district court. The first possibility is the test enunciated in Youngberg v. Romeo, --- U.S. ----, ----, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982) ("decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment"). The second possibility is that the Does must show that the medical or therapeutic basis for the rule was a mere pretext. By suggesting the foregoing as two possible tests, we do not express an opinion that the two are substantially different, or that other possibilities should not be considered
 
 
 [1]
 The district court entered its order dismissing the amended complaint before Doe filed a reply to the motion. Doe requested the court to reconsider its earlier dismissal contending that the applicable time period for filing a reply had not expired when the order was entered. Finding this contention erroneous, the district court reaffirmed the order dismissing the amended complaint
 
 
 [2]
 Although the Parham Court recognized the necessity of an independent and periodic procedure by which to gauge a child's need for continued hospitalization, the Court stopped short of prescribing appropriate procedures. Parham, 442 U.S. at 607 n. 15, 99 S.Ct. at 2506 n. 15. See also, Secretary of Public Welfare v. Institutionalized Juveniles Et Al., 442 U.S. 640, 650 n. 9, 99 S.Ct. 2523, 2528 n. 9, 61 L.Ed.2d 142. The circumstances of the instant case require that we address this issue left open in Parham. As my position makes clear, the parent must be allowed to monitor the child's continuing need for medical attention
 
 
 [3]
 It must be kept in mind that this no communication therapy is simply one of many treatment programs. An adult voluntarily committed, or an adult involuntarily committed, through a guardian, may reject a specific treatment program. I would merely hold that a parent, acting for his child, has the same right
 We are not faced with the question of balancing interests between the state and a patient in a situation where the patient will resort to violence or other anti-social behavior in the absence of a specific treatment program or administration of a specific anti-psychotic drug.