**DARRYL H., et al., Plaintiffs,**

**v.**

**Gregory COLER, et al., Defendants.**

**No. 83 C 0628.**

United States District Court,
N.D. Illinois, E.D.

April 25, 1984.

Patrick T. Murphy, Patrick T. Murphy, Ltd., Chicago, Ill., for plaintiffs.

Neil F. Hartigan, Atty. Gen. by Stephen G. Kehoe, Asst. Atty. Gen., State of Illinois, Chicago, Ill., for defendants.

## MEMORANDUM ORDER

BUA, District Judge.

The matter before the Court is a suit brought by plaintiffs, the H. family, against individual members of the Illinois Department of Children and Family Services, and others. The H. family claims that defendants violated their constitutional rights during an investigation of a report of alleged child abuse in their home. Jurisdiction is vested in this Court under 28 U.S.C. §§ 1331 and 1343. Certain defendants move for summary judgment and plaintiffs move for partial summary judgment on the issue of liability, but request a trial on the issue of damages.[1] Plaintiffs also request that this Court require defendants to divulge the name of the mandated reporter who initiated the H. family investigation. For the reasons stated below, the Court denies both of plaintiffs' motions and grants defendants' motion for summary judgment.

### I. FACTS

The plaintiffs in this case, the H. family, comprise a family unit of a stepfather, mother and two children, ages six and seven. On October 26, 1982, Paula Davis, a caseworker for the Illinois Department of Children and Family Services ("DCFS"), went to the H. family's home to investigate a complaint of suspected child abuse[2] received by DCFS from a mandated reporter.[3] Davis, finding the two adults at home

---

1. Plaintiffs' request for partial summary judgment is assumed, although it is not clear, from a brief statement made at the end of their memorandum in opposition to defendants' motion for summary judgment.

2. The term child abuse as used in this opinion is meant to include child abuse and/or neglect as defined in Ill.Rev.Stat., ch. 23, § 2053.

3. Section 2054 of the Illinois Abused and Neglected Child Reporting Act, Ill.Rev.Stat. ch. 23, § 2054, denominates several groups of professionals as mandated reporters including, but not limited to, teachers, social services workers and medical personnel. Mandated reporters are required to immediately report to DCFS any child they have reasonable cause to believe is being abused or neglected.

when she arrived for her investigation, explained the purpose of her visit and was allowed into the home in order to discuss the allegations.[4] Davis interviewed the mother and stepfather at home and indicated that an interview with the children would be necessary.

The two adult plaintiffs then accompanied Davis to the children's school. At school, the H. children were called into a room near the principal's office. After asking their stepfather, but not their mother, to leave the room, Davis questioned the children about facts pertinent to the allegations. The children indicated that they were only spanked infrequently by their mother, bathed daily and had adequate food. At this point, Davis proceeded to conduct a physical examination of the two children with the help of the mother, but over the mother's objection.[5]

Davis concluded that the report of abuse concerning the H. children was unfounded. Accordingly, Davis, pursuant to DCFS policy, notified the H. family of the finding and deleted all information identifying the family from the State Central Register.

The H. family now brings suit in this Court alleging deprivation of their constitutional rights under the fourth, fifth, ninth and fourteenth amendments.[6] Plaintiffs claim that defendants, by searching their home and their children, violated plaintiffs' right to be free from unwarranted state intrusion into their family privacy and their right to be free from an unreasonable or warrantless search of their home and children. To this end they have named as defendants: the Director of DCFS, Gregory Coler; the Administrator, Child Protective Services of DCFS, William Ryan; the caseworker of DCFS, Pamela Davis; the Cook County Administrator, Child Protective Services Unit, James Winter; and the Supervisor of the Chicago Training Center of DCFS, Bruce Woll; in their official and unofficial capacities (hereafter collectively referred to as "the State defendants"). Plaintiffs seek injunctive relief against the State defendants which would prohibit future enforcement of DCFS' policy of searching homes and children in suspected child abuse cases without warrants. Plaintiffs also seek actual and punitive damages for the emotional harm they have suffered. Finally, the H. family alleges that DCFS violated their right to family privacy by not investigating the complaint of the mandated reporter to determine if it was made in good faith.[7]

4. Plaintiffs admit that they consented to allow Davis into their home. Plaintiff's Memorandum, filed August 15, 1983, at 2–3. They argue, however, that the consent was not voluntary because they were intimidated when confronted by a state official at their door and, being uneducated, they did not know that they had any alternatives. Davis responds that she was voluntarily let into their home and that she was not intimidating but, to the contrary, is five feet two inches tall and at the time was eight months pregnant.

5. It is disputed by the parties whether only some or all of the children's clothing was removed and whether there was consent to the physical examination. There is also a conflict regarding whether the room in which the exam took place had a closed or partially open door. Defendants state that the search was conducted with the aid of the children's mother, to which the parents never objected, and with the door closed at all times. Plaintiffs do not deny that the mother assisted Davis in removing the children's clothes, but state that Davis said it was DCFS policy to force children to strip, and that the parents objected to the examination. Plain-

tiffs also allege that the door to the room was partially open and the examination was done in view of people in the principal's office. In a motion for summary judgment the facts should be construed in the light most favorable to the party against whom summary judgment is being sought. Therefore, for purposes of this opinion, it is assumed that the parents initially objected to the search of their children's bodies and that the door was left partially open.

6. Because the parties do not argue the fifth amendment claim, and the ninth amendment claim is included in the fourteenth amendment analysis, the fifth and ninth amendment claims will not be specifically addressed by this Court.

7. On August 13, 1983, plaintiffs amended their complaint to include as defendants Dorothy Berg, Principal of Funston School; the Chicago Board of Education, which their children attend; and other unnamed and presently unknown individuals who are employees of the Chicago Board of Education. The H. family suspects that the mandated reporter is someone at their children's school and they argue that the

## II.  OVERVIEW OF DCFS PROCEDURE

The Abused and Neglected Child Reporting Act, Ill.Rev.Stat., Ch. 23, Sec. 2051, *et seq.* (1975), (hereinafter "the Act") mandates that DCFS shall, upon receiving reports of abuse, "protect the best interest of the child, offer protective services in order to prevent any further harm to the child and to other children in the family, stabilize the home environment and preserve family life wherever possible." Ill.Rev.Stat., ch. 23, § 2052.  The Act authorizes DCFS to conduct child protective investigations to accomplish these goals.  DCFS, under the direction of Gregory L. Coler, developed the Child Abuse and Neglect Investigations Decisions Handbook in July of 1982 (hereinafter "Decisions Handbook") which delineates guidelines for all of the steps involved in investigating a report of abuse or neglect.

Initially, DCFS may receive an allegation of abuse or neglect over its 24-hour-a-day, 365-day-a-year toll-free reporting hotline. A call must meet several criteria, however, before it is considered to constitute a report of abuse or neglect:

1.  The child must be less than 18 years of age;

2.  The child must either have been harmed, or be in danger of harm or of a substantial risk of harm;

3.  A specific incident or circumstances which suggests the harm was caused by child abuse or neglect has been identified;

4.  A parent or caretaker must be the alleged perpetrator of neglect;

5.  A parent or other caretaker, an adult family member, an adult individual residing in the same home as the child, or the parent's paramour must be the alleged perpetrator of abuse.

DCFS Procedures Part 302.5(b) at pp. 10–11.

The Act denominates several groups of professionals as mandated reporters.  Ill. Rev.Stat. ch. 23, § 2054.  Mandated reporters include social service, school, law enforcement and medical personnel.  They are required to immediately report to DCFS any child they have reasonable cause to believe is an abused or neglected child. Any person who "knowingly transmits a false report" to the hotline may be criminally charged with disorderly conduct.  Ill. Rev.Stat., ch. 23, § 2054.

An investigative visit with an alleged child abuse victim and the family must begin within 24 hours of the report or, in the case of an emergency, the investigation must begin immediately.  DCFS Procedures §§ 302.5(g)(1) and 302.5(g)(2), pp. 23–24.  The caseworker is instructed to introduce him or herself to the caretaker[8] as a representative of DCFS, explain the purpose of the visit, and inform the caretaker of the receipt of a neglect or abuse report. Decisions Handbook, pp. 44–45.  The procedure to be followed in the event that the caseworker is denied access to the child is as follows:

> When the parent, caretaker, or another person denies the investigative worker access to child subjects required to be seen by the Investigative Standards, the

report was made in bad faith and merely to intimidate and harass them.  The H. family believes this to be true because for approximately one year before the report was made, the H. family and Dorothy Berg had a continuing argument over whether or not the children could be compelled to eat lunch at the school.  The H. family felt that they had the right to feed their children lunch at home and finally produced a note from a doctor stating that the children should eat at home.  This ended the debate. The H. family now alleges that Dorothy Berg or another member of the school board violated their fourth, fifth, ninth and fourteenth amendment rights to be free from intrusion by government officials into their family privacy because

she reported them to DCFS purely for the purpose of harassing and intimidating them.  The defendants have answered the amended complaint and raise affirmative defenses on their behalf, but have not moved for summary judgment.

**8.**  Caretaker refers to "the child's parent; guardian; foster parent; any other person responsible for the child's care at the time of the alleged abuse or neglect; or any other person responsible for the child's welfare in a public or private residential agency or institution."  Ill.Rev. Stat., ch. 23, § 2053.

investigative worker shall explain that Illinois law gives the worker authority to see the children. If the worker is still denied access to the children, the worker shall immediately contact the local law enforcement agency and request immediate assistance in contacting the child. If necessary to obtain access, the worker shall pursue a court order. Procedures Part 302.5(d)(7), p. 21. *See also* Decisions Handbook, pp. 44–45.

Once inside the home, the DCFS worker should observe any areas of the home that are "reasonably related to the allegations of abuse or neglect." Procedures Part 302.5(g)(3)(v), p. 26. The Decisions Handbook also gives the following guidelines for when it is necessary to observe the child's body for evidence of physical abuse:

The worker should observe the child's body for evidence of physical abuse. When a physical examination is necessary to verify the allegations, the worker can select from the following options: The worker should consult with the caretaker and offer three options:

1. The caretaker can take the child to a physician or hospital emergency room for a physical examination.

2. The worker will take the child to a physician or hospital emergency room for a physical examination.

3. The caretaker and the worker can jointly disrobe the child and conduct a cursory physical examination.

If the child is at school, the worker should attempt to contact the caretaker before having the school nurse examine the child. The caretaker should be provided with the above three options and a fourth one which involves having the school nurse examine the child. If the caretaker cannot be reached, the worker should have the school nurse examine the child.

There are a number of restrictions which apply to the preceding options. They are:

Physical examinations of children alleged to be sexually abused should be conducted by a physician or other medical personnel, not the worker. The first two options above apply in this situation. Although it is preferable that a physician conduct an exam, if physical examinations are performed by the worker and the caretaker or other adult, for children over 13 it *must* be conducted by a worker who is the same sex as the child. Similar examinations of school age children under 13 *should* be conducted by a person of the same sex as the child. A child who is severely ill should immediately be seen by a physician. The first two options only apply in this situation. Decisions Handbook, p. 66.

After viewing all of the evidence, the caseworker must determine whether credible evidence of abuse or neglect exists. Decisions Handbook, p. 87. If such evidence exists, the caseworker or follow-up DCFS staff shall provide services which ensure the child's safety and, if possible, solicit the caretakers' cooperation. If the caretakers are uncooperative, court intervention may be sought. If, however, the caseworker determines that the report of child abuse is unfounded, the investigation ceases. *Id.*

## III. DISCUSSION

The H. family alleges two violations of their constitutional rights: a violation of their fourth amendment right to be free from unreasonable searches and seizures of their home and children, and a violation of their fourteenth amendment due process right to be free from unwarranted government intrusion into the privacy of their family.

### A. *The Fourth Amendment Violations*

The H. family argues that the State defendants violated their fourth amendment rights both by searching their home and their children without a warrant.

#### 1. *Search of the Home*

Regarding the search of their home, the H. family argues that the State defendants violated their fourth amendment right to be free from unreasonable searches of their home because they did not have a

search warrant to enter their home and conduct the search. A valid exception, however, to the requirement of a warrant under the fourth amendment is voluntary consent by the parties subject to the search. *U.S. v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *U.S. v. Bolin*, 514 F.2d 554, 555, 559 (7th Cir.1975). The parties agree in this situation that the H. family parents consented to the search of their home by Davis. There is no issue, then, regarding the fact that there was consent to the search of the home.

■ The H. family argues, however, that their consent was not voluntary because they did not know that they had the right to refuse. When consent is relied upon to justify the lawfulness of a search by the government, the Constitution requires that it be demonstrated that the consent was voluntarily given, and not the result of duress or coercion. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); *U.S. v. Bolin*, 514 F.2d at 559. Whether or not the consent to the search was voluntary is a question of fact to be determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59; *Bolin*, 514 F.2d at 559. In *Schneckloth*, the Court specifically stated that the subject's knowledge of a right to refuse is only one of the factors to be taken into account and is not determinative of the question of voluntariness. 412 U.S. at 249, 93 S.Ct. at 2059; *Bolin*, 514 F.2d at 559.

Applying these principles to this case, the Court finds that the H. family's consent was voluntary notwithstanding the fact that they were not informed of their right to deny Davis access to the house. There are no other factors present which indicate that plaintiffs were coerced into allowing Davis into their home. As Davis points out, she is five feet two inches tall and was eight months' pregnant at the time of the investigation, hardly an intimidating figure. The Court therefore finds that the H.

family's consent to the search was voluntary and that there was no fourth amendment violation in the search of the H. family's home by the State defendants.

### 2. *Search of the Children*

■ The H. family also argues that the State defendants violated their fourth amendment right to be free from unreasonable searches of the children's bodies. According to the facts as stated previously, the search of the children was conducted by the State defendants over the objection of the caretakers but with the assistance of the mother. This Court holds that the examination of the children does not violate the fourth amendment for three reasons. First, the mother, by assisting Davis during the examination, consented to the search of the children. Second, even assuming that the mother's participation did not amount to consent, the physical examination does not constitute a "search" within the scope of the fourth amendment. Third, even assuming the examination can be considered a "search" under the fourth amendment, defendants' conduct does not descend to the level of unreasonableness. Each ground provides an independent basis for granting judgment for the State defendants.

The issue of whether there was consent to the search of the children is a fact to be determined by examining the totality of the circumstances. *Schneckloth*, 412 U.S. at 248–49. The sum of the circumstances in this case lead to the conclusion that the search was essentially consensual. The parents accompanied Davis to the school to interview the children which implicitly shows their consent to the interview. Although the parents state that they initially objected to the search, they do not deny that the mother assisted Davis in undressing the children. The H. family also argues that they were unaware of their right to refuse consent but, as stated previously, this is only one of the factors to consider in assessing voluntariness of consent, and it is not determinative. *Schneckloth*, 412 U.S. at 249, 93 S.Ct. at 2059; *Bolin*, 514 F.2d at 559. Therefore, given that both

caretakers accompanied Davis to children's school and that the mother assisted Davis in undressing the children, this Court finds that there was consent to the search of the children. Since consent is an exception to the requirement of a warrant, there was no fourth amendment violation in the search of the children by the State defendants.

Even assuming, however, that the caretakers did not consent to the search of the children at school, no fourth amendment violation occurred. In *Wyman v. James*, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), the Supreme Court held that a welfare caseworker's home visit was not a search within the meaning of the fourth amendment. The *Wyman* Court reasoned that the home visit was not primarily a criminal investigation but rather was a rehabilitative visit meant to protect the health and safety of the children involved.

In this case, as in *Wyman*, the state's interest is the health and safety of the children. DCFS has been given the task of protecting the state interest by investigating reported families for the purposes of protecting children from abuse and rehabilitation. DCFS' goal is to preserve the family unit whenever possible. Therefore, DCFS' primary purpose is not to criminally prosecute any of the family members. Davis did not search the children's bodies for the purpose of criminally prosecuting them, but for the purpose of ensuring their health and welfare. Therefore, as in *Wyman*, the search of the children's bodies for this purpose is not a search within the meaning of the fourth amendment and does not violate the children's fourth amendment right to be free from unreasonable searches.

The alternative holding in *Wyman* was that even if the home visit by the caseworker was considered to be a search, it still did not violate the fourth amendment because it did "... not descend to the level of unreasonableness." 400 U.S. at 318, 91 S.Ct. at 386. The *Wyman* Court gave many reasons for its decision, several of which apply here. The Court reasoned that there was a high state interest in being able to protect the dependent child's needs, which are of primary importance. Regarding the child's needs, the Court stated:

> "The focus is on the *child* and, further, it is on the child who is *dependent*. There is no more worthy object of the public's concern. The dependent child's needs are paramount, and only with hesitancy would we relegate those needs, in the scale of comparative values, to a position secondary to what the mother claims as her rights." 400 U.S. at 318, 91 S.Ct. at 386 (emphasis in original).

The *Wyman* Court next examined the means that the caseworker used to visit the home and decided that they were reasonable, and that no other means of investigation would be as effective for determining the necessary information. The Court also noted that the caseworker was trained to look after the welfare of the family.[9]

The same reasoning is applicable in this case to find that the interview and search of the children were not unreasonable. The State defendants have a strong interest in protecting dependent children and the parents' needs or rights are secondary in a situation of potential abuse. The means used by DCFS to examine a child's body are necessary to determine vital information regarding the child's health. The

---

**9.** Other courts have followed the reasoning of *Wyman* to determine that administrative searches or actions taken in furtherance of the public welfare are not constitutional violations. *See Doe v. Public Health Trust of Dade County*, 696 F.2d 901 (11th Cir.1983) (cites *Wyman* to support the decision that a mental hospital did not violate the family's constitutional right to familial association by precluding communication between the minor, voluntary patient and her parents because the treatment was medically legitimate and part of the benefit being offered by the State); *U.S. v. Rea*, 678 F.2d 382 (2nd Cir.1982) (noting that a probation officer may conduct a supervisory visit of probationer without a warrant); *U.S. v. Martell*, 654 F.2d 1356 (9th Cir.1981) (cites *Wyman* for the proposition that "... administrative searches have been upheld without a warrant, without probable cause and without a reasonable suspicion of the legality where they serve as a part of some governmental regulatory scheme" to protect the health and welfare of its citizens).

caseworkers are trained to look after the welfare of the family and to conduct the physical examinations under strict guidelines with limits on the nature and scope of the examination. Finally, there is no evidence in the record to suggest that alleged child abuse investigations are being conducted in an arbitrary manner. In sum, the search of the children by the State defendants was not unreasonable and did not violate the children's fourth amendment rights.[10]

Since the Court holds that no violation of the children's fourth amendment rights occurred, the issue of whether the parents have standing to bring suit on behalf of themselves based on the alleged fourth amendment violation due to the search of their children need not be addressed.

### B. *The Fourteenth Amendment Violation*

The H. family alleges that the State defendants violated their fourteenth amendment right to be free from unwarranted governmental intrusion into their family privacy or autonomy by interfering with their right to raise their children as they see fit. The Supreme Court has recognized that parents have a constitutionally protected right to act with autonomy in their decision-making about their family life. This right has generally been articulated as a right of privacy based on the concept of liberty in the fourteenth amendment. The right has been extended to many aspects of family life. *See Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (right to choice in matters of marriage and procreation for schoolteachers without mandatory termination by the school board); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (a woman has a qualified right to terminate her pregnancy); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (parental right to decide the religious training of their children out-

weighs the state's interest in public school education); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (married and unmarried people have the right to obtain contraceptives); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (the right to family privacy of an unwed father warrants deference and protection); *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (the right of privacy extends to safeguarding the privacy of the home); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (right to family privacy extends to the use of birth control); *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (right to marriage and procreation); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (liberty of parents to direct the education of their children); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (liberty of parents to have their children taught a foreign language).

Parental autonomy, however, is not absolute. The State, in its role as *parens patriae*, is the ultimate protector of the rights of children, and may act to provide for their health, safety and welfare when the parents fail to do so. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). In cases of suspected child abuse, the State has a clear interest in protecting the child from harm by the parents. To protect this interest, the State may, if necessary, go as far as to separate the neglectful parents from their children. *Stanley v. Illinois*, 405 U.S. at 652, 92 S.Ct. at 1213. DCFS has been given the responsibility of performing this important state interest by statute.

In several recent parental rights termination cases, where the State has in-

---

**10.** The plaintiffs' reliance on *Doe v. Renfew*, 631 F.2d 91 (7th Cir.1980) for the proposition that the search of the children was unconstitutional is misplaced. This case may be distinguished from *Renfew* on at least two points. The first is

that the *Renfew* case involved a criminal investigation while this case does not. The second distinction is that in *Renfew* there was no consent to the search while in this case there is.

tervened to protect the child's interest at the risk of intruding on the family's right to privacy, the Supreme Court has held that the constitutional requirement of due process applies to protect the parent's rights. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Little v. Streater*, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981); *Lassiter v. Dept. Social Sciences*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). To determine what process is due in a parental rights termination proceeding, the balancing test articulated in *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) is applicable. The three distinct factors to be balanced in this test are: (1) the private interests affected by the proceeding; (2) the risk of erroneous deprivation of private interests resulting from the State's chosen procedure; and (3) the countervailing State interests supporting use of the challenged procedure. *See Santosky*, 455 U.S. at 754, 102 S.Ct. at 1394. Since the same interests and concerns are involved during the investigative phase of a child abuse proceeding as during the parental rights termination phase, the same balancing analysis can be applied to determine what process is due parents when they are being investigated for alleged child abuse.

First, the private interests involved are the family's right to privacy and the parents' right to autonomy in decision-making regarding their children without undue interference from the State. These rights are legitimate, constitutional rights recognized by the Supreme Court, as previously discussed.

Likewise, the State's interest in preventing child abuse and neglect is obviously great. In Illinois, 59,194 reports of child abuse were filed during fiscal year 1982. *Child Abuse And Neglect Statistics, Annual Report,* Illinois Department of Children and Family Services (1982), at 2. DCFS determined that 25,677 of these reports were "founded." *Id.* Moreover, given the potentially devastating consequences of undetected child abuse plus the inherent difficulty in uncovering child abuse cases, State authorities need proce-

dures which accurately and quickly detect abuse. Procedures which uncover abuse after the fact, no matter how accurate, are of little value.

These two interests must next be balanced against the last factor to be considered: whether the procedures employed by the State risk erroneous deprivation of the private family rights. As previously noted, the DCFS guidelines require a caseworker to initially attempt to obtain consent from a family before entering their home and, if consent is denied, contact a law enforcement agency or obtain a warrant. This procedure allows the State to proceed with all due speed while protecting the family's right to be free from unconstitutional searches of their home by either gaining their consent, an exception to the warrant requirement, or procuring a warrant. Therefore, the State procedure of investigating reports of alleged abuse by going to the family's home within 24 hours without first procuring a warrant does not risk erroneous deprivation of the family's rights.

Neither does the State's procedure of examining children's bodies in order to determine if the report of abuse is founded create a substantial risk of erroneous deprivation of the children's rights. The examination is not a criminal investigation of the children, but meant to protect and help them. The examination is conducted either by qualified medical personnel or by a caseworker with the caretaker's assistance. Any findings from the examination are persuasive evidence regarding the allegations of abuse, and therefore tend to decrease the chance of an erroneous finding of child abuse. If abuse is present, the procedure protects the child's interest by preserving valuable evidence which would otherwise dissipate, since the parent would likely attempt to conceal it. If, however, no abuse is involved, the procedure protects the parents' interest by stopping the investigation at an early stage.

██ In summary, the State procedures for investigating a report of alleged child

abuse act to protect the private interests involved, with little risk of erroneous deprivation of these rights. The investigation by the State defendants is performed by a trained caseworker under strict guidelines in such a way that a minimal intrusion into the family's rights is involved. The caseworker has several well-defined options available to him or her for dealing with each phase of the investigation. Initially, a report of child abuse or neglect must meet certain criteria before it will even be investigated. The caseworker will not enter a family's home without consent, law enforcement personnel, or a court order. There are several options available to the caseworker for examining the potentially abused child's body, but the caseworker is never to do so alone, without the assistance of medical personnel or the child's caretaker. The State defendants have taken care to ensure that the State intrusion into the family's privacy is done in a way that minimizes and limits that intrusion, and is done with the welfare of the family, especially the child, in mind. For these reasons, the Court finds that there is no violation of the H. family's fourteenth amendment's right to privacy due to the investigation and search of their home and the children.

### C. *Motion to Divulge the Mandated Reporter's Name*

■ The Court denies the H. family's motion to require the State defendants to divulge the name of the person who reported abuse in their home. Under the Illinois *Abused and Neglected Child Reporting Act*, Ill.Rev.Stat., ch. 23, § 2059, a mandated reporter is given immunity from liability for good faith reporting of possible child abuse:

> Any person, institution or agency, under this Act, participating in good faith in the making of a report ... shall have immunity from any liability, civil, criminal or that otherwise might result by reason of such actions. For the purpose of any proceedings, civil or criminal, *the good faith of any persons required to report* ... cases of suspected child abuse or

neglect under this Act, *shall be presumed.* (emphasis added)

The release of information concerning the identity of such persons is also prohibited as provided in § 2057.19:

> Upon request, a subject of a report shall be entitled to receive a copy of all information contained in the central register pertaining to his case. However, the Department may prohibit the release of data that would identify or locate a person who, in good faith, made a report or cooperated in a subsequent investigation....

Finally, under § 2061, "All records concerning reports of child abuse and neglect and all records generated as a result of such reports, shall be confidential and shall not be disclosed except as specifically authorized by this Act or other applicable law...."

The presumption of good faith afforded by § 2059 on the part of the mandated reporter must be rebutted in order to have the name divulged. The H. family has not sufficiently rebutted this presumption but has only offered evidence of a disagreement between themselves and the principal of their children's school. There is no evidence presented that the report was made only to harass or intimidate the H. family. Therefore, in order to further the policy of protection of mandated reporters intended by the Act, plaintiffs' motion is denied.

## IV. SUMMARY

For the reasons stated above, the State defendants' motion for summary judgment is granted. Plaintiffs' motions for partial summary judgment and to divulge the name of the mandated reporter are denied.

IT IS SO ORDERED.