STEPHEN LEHMAN *et al.*, Plaintiffs-Appellants, v. FRANK STEPHENS *et al.*, Defendants-Appellees.

Fourth District   No. 4—86—0041

Opinion filed October 9, 1986.

540

Law Offices of Ora J. Baer II, of Champaign, for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Candida Miranda, Assistant Attorney General, of Chicago, of counsel), for appellees Kathy McDonald and Illinois Department of Children and Family Services.

Keith E. Emmons, of Dobbins, Fraker, Tennant, Joy & Perlstein, of Champaign, for appellees Dr. Frank Stephens, Carle Clinic Association, and Carle Foundation Hospital.

JUSTICE MORTHLAND delivered the opinion of the court:

Plaintiffs filed a five-count complaint seeking damages after their minor son Matthew was admitted to the defendant Carle Foundation Hospital (Carle) for two days for observation and on a suspicion of abuse and neglect. The suit concerns the actions of the examining physician, defendant Dr. Frank Stephens, who made a report of possible abuse or neglect to the defendant Department of Children and Family Services (DCFS), and defendant Kathy McDonald, a DCFS child-protective worker, who acted to take official temporary protective custody of the child. Dr. Stephens and Carle filed a motion to dismiss the complaint, raising the immunity from civil liability afforded under the Illinois Abused and Neglected Child Reporting Act (the Act) (Ill. Rev. Stat. 1983, ch. 23, par. 2051 *et seq.*). Defendants DCFS and Kathy McDonald also filed a motion to dismiss, asserting that exclusive jurisdiction of the matter rested in the Court of Claims. The

circuit court of Champaign County granted both motions, and the plaintiffs appeal.

On June 2, 1984, a Saturday, Matthew, then about 16 months old, was brought by his parents to the Carle Foundation Hospital in Champaign after suffering an apparent injury to his right leg. Dr. Stephens, the examining physician, questioned the plaintiffs as to the origin of Matthew's injury. They responded that the boy was in another room playing by himself or with his older brother when they suddenly heard him cry out. The plaintiffs stated they found their son lying on the floor crying, refusing to bear weight on his right leg. They also related to Dr. Stephens that there was nothing in the room from which the child could have fallen and twisted his leg.

The injury was diagnosed as a spiral fracture of the right tibia. According to his report of the examination, Dr. Stephens was "suspicious" of the cause of the fracture in light of the "twisting type" of injury evident and his dissatisfaction with the parents' explanation. Dr. Stephens further reported that this type of injury normally does not occur when a child merely falls down. He also believed the parents exhibited a "rather light and unconcerned" attitude toward the severity of the injury. Upon expressing his concerns to them, it was Dr. Stephens' opinion that the plaintiffs became "quite defensive" regarding the possibility of direct abuse.

Dr. Stephens then decided to admit the child to the hospital for observation against the parents' wishes. He also made a report of his observations to DCFS pursuant to the Illinois Abused and Neglected Child Reporting Act (Ill. Rev. Stat. 1983, ch. 23, par. 2051 *et seq.*).

Defendant Kathy McDonald, a DCFS worker, received a call that same day from the State central register hotline regarding the Matthew Lehman case. McDonald then telephoned Dr. Stephens, who informed her of the particulars of his suspicions. She also interviewed the parents that evening. The following day, a Sunday, she received a telephone call from an unnamed physician indicating that Matthew's father wanted to have the boy released from the hospital. McDonald then contacted the Champaign County State's Attorney, who advised that protective custody of the child be taken.

On Monday, June 4, Matthew was released from protective custody and returned to his parents. There is some indication that the decision to release was made after a determination that the charges were "unfounded."

Based upon these circumstances, on May 31, 1985, the plaintiffs, acting individually and with the father as next friend for Matthew, filed a five-count complaint against the defendants. Counts I and II

purported to allege slander against Dr. Stephens and Carle. Counts III, IV and V, naming all parties as defendants, sounded in unlawful restraint, false imprisonment, and battery, respectively.

Defendants Dr. Stephens and Carle filed a motion to dismiss pursuant to section 2—619(a)(9) of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—619(a)(9)) on July 9, 1985. Defendants claimed statutory immunity from the plaintiffs' lawsuit under certain provisions of the Reporting Act (Ill. Rev. Stat. 1983, ch. 23, pars. 2055, 2059). This motion was supported by the attached affidavit of Dr. Stephens, which stated he believed "to a reasonable degree of medical certainty" that Matthew may have been an abused or neglected child as defined under the Act. The affidavit further recounted that Dr. Stephens' report to DCFS was made in good faith, based upon his examination of Matthew, his discussion with the parents, and his expertise and skill as a physician. A copy of a Carle Foundation Hospital report prepared by Dr. Stephens at the time of admission, based upon his physical examination of Matthew, was also filed with the motion to dismiss.

Defendants Kathy McDonald and DCFS filed their motion to dismiss on August 9, 1985. These defendants claimed that jurisdiction rested exclusively in the Court of Claims, as the action was in reality one against the State, and that in any event they were free from liability based upon sovereign immunity.

In response, plaintiffs presented objections to the motions to dismiss accompanied by their own affidavit and copies of progress notes from the hospital. Plaintiffs claimed these notes did not support an "objective" opinion that plaintiffs were abusive to Matthew or that the child's life or health was ever in imminent danger were he allowed to remain in the custody of his parents.

On September 3, 1985, the circuit court by written order ruled the cause of action against defendants Dr. Stephens and Carle was barred by the immunity provided in sections 5 and 9 of the Act (Ill. Rev. Stat. 1983, ch. 23, pars. 2055, 2059), and dismissed counts I through V with prejudice as to them. On September 16, 1985, the circuit court ruled that the court of claims had exclusive jurisdiction as to defendants McDonald and DCFS, dismissed the complaint as to them based upon lack of jurisdiction, and further denied the plaintiffs' oral motion to amend their complaint. Plaintiffs' two subsequent motions for reconsideration of these separate orders were also denied by the court below.

On appeal, plaintiffs first assert that sections 5 and 9 of the Act, which provide the immunity from civil liability relied upon by the

court below, are unconstitutional. Plaintiffs further contend that the trial court erred in dismissing their complaint when it relied on the immunity set forth under those provisions of the Act and when it found that their claim against defendant McDonald must be maintained in the court of claims.

Essential to a resolution of this matter is a brief overview of the contested provisions of the Act. The authority to take or retain temporary protective custody without the consent of the persons otherwise responsible for the child's welfare arises out of section 5 of the Act (Ill. Rev. Stat. 1983, ch. 23, par. 2055). However, that authority is expressly limited to three enumerated groups of people: officers of a local law-enforcement agency, designated employees of DCFS, or treating physicians. (Ill. Rev. Stat. 1983, ch. 23, par. 2055.) Moreover, the statute in effect at the time of the complained-of actions mandated that the following three factors must be present to retain custody:

"(1) [There is] reason to believe that the circumstances or conditions of the child are such that continuing in his place of residence or in the care and custody of the person responsible for the child's welfare, presents an imminent danger to that child's life or health; and (2) the person responsible for the child's welfare is unavailable or has been asked and does not consent to the child's removal from his custody; and (3) there is not time to apply for a court order under the Juvenile Court Act for temporary custody of the child." Ill. Rev. Stat. 1983, ch. 23, par. 2055.

Section 5 provides that any "authorized" person, presumably one falling within the three aforementioned groups and acting with those three factors present, shall be immune from any civil or criminal liability that might otherwise be incurred, so long as that person acts in good faith. Any authorized physician acting in good faith and in accordance with acceptable medical practice in the treatment of a child is also granted immunity. Ill. Rev. Stat. 1983, ch. 23, par. 2055.

Pursuant to section 9, immunity is also afforded to any person, institution, or agency which participates in good faith in the making or investigating of a report, in the taking of photographs or X rays, or in the retaining of temporary protective custody of a child. (Ill. Rev. Stat. 1983, ch. 23, par. 2059.) Significantly, the good faith on the part of any person either required or permitted to report cases of suspected abuse under the Act is presumed. Ill Rev. Stat. 1983, ch. 23, par. 2059.

To facilitate uncovering cases of abuse or neglect, certain medical

personnel and staff members of public or private institutions who would tend to come into contact with such cases are denoted as reporters under the Act. (Ill. Rev. Stat. 1983, ch. 23, par. 2054.) Should any such required reporter have "reasonable cause to believe a child known to them in their professional or official capacity may be an abused child or a neglected child," they shall immediately report or cause a report to be made to DCFS. (Ill. Rev. Stat. 1983, ch. 23, par. 2054.) In addition, others are permitted to make a report under the Act should they have reason to believe a child is abused or neglected. To ensure that conscientious reports are made, and in recognition of the gravity of such circumstances, anyone who knowingly transmits a false report to DCFS may be criminally charged with disorderly conduct. Ill. Rev. Stat. 1983, ch. 23, par. 2054.

Turning now to the substantive issues raised by the parties, we note that the plaintiffs' initial argument assails the constitutionality of the Act in three respects. First, they contend that section 5, which they maintain permits parental rights to be terminated without any hearing or court proceeding, is violative of the due-process clause of the fourteenth amendment (U.S. Const., amend. XIV), and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, sec. 2). Second, plaintiffs assert that section 5 denies equal protection of the laws, as it provides immunity "only to particular people." Third, plaintiffs believe the immunity granted in sections 5 and 9 runs afoul of article I, section 12, of the Illinois Constitution, which states that there shall be a "certain remedy" for all injuries and wrongs. Ill. Const. 1970, art. I, sec. 12.

■ At the outset, we believe it important to recognize that a strong presumption of constitutionality attaches to any properly authorized legislative enactment, and the burden rests on the party challenging the law to demonstrate its invalidity. (*People v. Joseph* (1986), 113 Ill. 2d 36, 41, 495 N.E.2d 501, 503; *People v. La Pointe* (1981), 88 Ill. 2d 482, 500, 431 N.E.2d 344, 352.) With this in mind, we consider first whether the contested provisions meet fundamental due process requirements.

The United States Supreme Court has established the framework for analyzing any claim of a due process violation. Initially, it must be determined if the complaining party had been deprived of "interests encompassed by the Fourteenth Amendment's protection of liberty and property." (*Board of Regents v. Roth* (1972), 408 U.S. 564, 569, 33 L. Ed. 2d 548, 556, 92 S. Ct. 2701, 2705.) Where such a deprivation occurs, the remaining question is the extent of the process that is due. *Morrissey v. Brewer* (1972), 408 U.S. 471, 484, 33 L. Ed. 2d 484,

494, 92 S. Ct. 2593, 2602.

Without doubt, freedom of personal choice in matters of family life is one of the fundamental liberty interests protected by the fourteenth amendment. (*Quilloin v. Walcott* (1978), 434 U.S. 246, 255, 54 L. Ed. 2d 511, 519, 98 S. Ct. 549, 555; *Cleveland Board of Education v. La Fleur* (1974), 414 U.S. 632, 39 L. Ed. 2d 52, 94 S Ct. 791; *Darryl H. v. Coler* (N.D. Ill. 1984), 585 F. Supp. 383, 390 (and cases cited therein).) Natural parents have a fundamental interest in the care, custody, companionship, and management of their children. (*Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208.) As a matter of familial privacy, parents should be able to remain together free from undue outside interference. *Duchesne v. Sugarman* (2d Cir. 1977), 566 F.2d 817.

These interests in family autonomy, then, trigger the constitutional requirements of due process. (*Lassiter v. Department of Social Services* (1981), 452 U.S. 18, 68 L. Ed. 2d 640, 101 S. Ct. 2153.) Thus, where the State moves to terminate the relationship between a parent and child, it must provide the parents with "fundamentally fair procedures." (*Santosky v. Kramer* (1982), 455 U.S. 745, 754, 71 L. Ed. 2d 599, 606, 102 S. Ct. 1388, 1395.) Given that a constitutionally protected interest has been raised, the remaining question before us is exactly what process is due here, and whether it has been met.

■ Of course, due process is a flexible concept, depending in each instance on the nature of the governmental function involved as well as the private interest affected by that action. (*Goldberg v. Kelly* (1970), 397 U.S. 254, 263, 25 L. Ed. 2d 287, 296, 90 S. Ct. 1011, 1018.) Accordingly, a balancing test first articulated in *Mathews v. Eldridge* (1976), 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893, has been held applicable to determine what process is due in parental rights termination proceedings. (*Santosky v. Kramer* (1982), 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388; *Lassiter v. Department of Social Services* (1981), 452 U.S. 18, 68 L. Ed. 2d 640, 101 S. Ct. 2153.) Under the *Mathews* test, three distinct factors are to be balanced: (1) the private interests affected by the proceedings; (2) the risk of erroneous deprivation of private interests resulting from the State's chosen procedure; and (3) the countervailing State interest supporting use of the challenged procedure. *Santosky v. Kramer* (1982), 455 U.S. 745, 754, 71 L. Ed. 2d 599, 609, 102 S. Ct. 1388, 1395; see also *Mathews v. Eldridge* (1976), 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893.

As described above, the private interests in self-autonomy, freedom of choice in family matters, and maintaining the family structure

free from undue State interference are great. Likewise, the children have a strong interest in not being disassociated from daily contact with their parents, an interest which helps support their emotional attachments, their well-being, and the intimacy of the parent-child relationship. The reciprocal rights of the parent and child are certainly among the most basic, essential aspects of family freedom and privacy.

■ Parental autonomy, however, is not absolute. While parents enjoy an inherent right to the care and custody of their own children, the State, in its recognized role as *parens patriae*, is the ultimate protector of the rights of minors. The State is substantially interested in providing for their health, safety, and welfare, and may properly step in to do so when appropriate. (*Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208; *Prince v. Massachusetts* (1944), 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438; *In re Wheat* (1979), 68 Ill. App. 3d 471, 386 N.E.2d 278.) While this *parens patriae* interest in promoting the welfare of the child favors preservation, not severance, of natural family bonds (*Santosky v. Kramer* (1982), 455 U.S. 745, 766-67, 71 L. Ed. 2d 599, 615, 102 S. Ct. 1388, 1401-02), the countervailing State interest in curtailing child abuse is also great. In cases of suspected abuse or neglect, the State has a clear interest in protecting the child (*Darryl H. v. Coler* (N.D. Ill. 1984), 575 F. Supp. 383), and may, if necessary, go as far as to separate neglectful parents from their children (*Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208). As such, the parents' needs or rights may be considered secondary to the State's strong interest in protecting children where the potential for abuse or neglect exists. *Darryl H. v. Coler* (N.D. Ill. 1984), 585 F. Supp. 383.

To that end, DCFS has been charged with the task of upholding the State's interest in preventing child abuse or neglect. In addition to the reporting and protective custody guidelines of the Act, it is further mandated:

> "Sec. 2. The Illinois Department of Children and Family Services shall, upon receiving reports made under this Act, protect the best interests of the child, offer protective services in order to prevent any further harm to the child and to other children in the family, stabilize the home environment and preserve family life whenever possible." Ill. Rev. Stat. 1983, ch. 23, par. 2052.

Plaintiffs apparently concede the relative weight of both the private and State interests involved. Instead, in arguing that parental rights should not be "taken away without any court proceedings,"

plaintiffs submit that the contested provisions of the Act allow for great risk of erroneous deprivation of private rights where the State and physicians may summarily remove a child from the custody of his parents.

However, we find the plaintiffs' due process arguments wholly unpersuasive. Given the potentially devastating consequences of continued, undetected child abuse, as well as the inherent difficulty in uncovering such cases, State authorities like DCFS are concerned with having available procedures to detect abuse or neglect as quickly and accurately as possible. "Procedures which uncover abuse after the fact, no matter how accurate, are of little value." *Darryl H. v. Coler* (N.D. Ill. 1984), 585 F. Supp. 383, 391.

Under section 5 of the Act, three enumerated groups of people may take or retain *temporary* protective custody where three expressed factors are present. (Ill. Rev. Stat. 1983, ch. 23, par. 2055.) The person taking temporary custody must immediately notify DCFS as well as make every reasonable effort to contact those persons responsible for the child. DCFS is then required to promptly initiate proceedings pursuant to the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 701—1 *et seq.*) for the continued, judicially sanctioned temporary custody of the child. Arguably in furtherance of the State's avowed interest in uncovering child abuse or neglect, sections 5 and 9 shield reporters under the Act from liability that might otherwise be incurred, provided they acted in good faith.

Once proceedings are promptly initiated under the Juvenile Court Act upon receiving a report, DCFS is empowered to conduct an investigation into the possible abuse or neglect. Should abuse or neglect be detected, the procedure protects the rights of the child as well as those of the State. If, however, no abuse is present and the report is determined "unfounded," the Act protects the parents' private interests by immediately terminating both the investigation and temporary custody at the earliest possible stage.

■ Clearly, then, the Act protects both the interests of the State and the parents while also minimizing the risk of erroneous deprivation of rights. Although some potential for error exists, due process has never been construed to be so comprehensive as to preclude any possibility of error. (*Mackey v. Montrym* (1979), 443 U.S. 1, 13, 61 L. Ed. 2d 321, 331, 99 S. Ct. 2612, 2618.) Instead, the duration of any potentially wrongful deprivation of a property interest, an important factor in assessing the impact of official action on private interests (*Fusari v. Steinberg* (1975), 419 U.S. 379, 42 L. Ed. 2d 521, 95 S. Ct. 533), is relatively short in comparison to the perceived evils to be

remedied. The procedures and safeguards mandated by the Act, we believe, strike a proper balance between the privacy rights involved while promoting important interests.

The plaintiffs' related due process contention, that parental rights should not be taken away without court proceedings, is similarly without merit. First, no parental rights are permanently and irrevocably terminated; instead, temporary protective custody only is taken pursuant to the Act. Second, it is well established that a post-deprivation hearing may still satisfy due process requirements. (*Goffinet v. County of Christian* (1976), 65 Ill. 2d 40, 357 N.E.2d 442.) "Some form of hearing" is all that is required before the permanent deprivation of a protected property interest. *Logan v. Zimmerman Brush Co.* (1982), 455 U.S. 422, 71 L. Ed. 2d 265, 102 S. Ct. 1148; *Board of Regents v. Roth* (1972), 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701.

Moreover, when a child's health or safety is threatened, "action first and a hearing afterward" is often justified. (*Lossman v. Pekarske* (7th Cir. 1983), 707 F.2d 288, 291.) In such so-called "emergency" situations, as a matter of due process analysis, the initial removal of a child without parental consent or a prior court order is entirely permissible. (*Duchesne v. Sugarman* (2d Cir. 1977), 566 F.2d 817, 826.) We therefore conclude that section 5, which provides for temporary protective custody, does not violate due process.

■ Next, plaintiffs make the bare assertion, without support, that the immunity provided in favor of local law-enforcement officials, designated DCFS employees, and treating physicians under section 5 constitutes a denial of equal protection of the laws "since it provides immunity for taking a child only to particular people." However, we are at a loss as to how similarly situated persons are being treated dissimilarly, a threshold determination under any equal protection analysis (*People v. Bradley* (1980), 79 Ill. 2d 410, 403 N.E.2d 1029), and we fail to perceive any possible violation of equal protection.

■ Plaintiffs next urge that the grant of immunity under sections 5 and 9 will deprive them of a remedy at law for a wrong done to them in violation of article I, section 12, of the Illinois Constitution (Ill. Const. 1970, art. I, sec. 12), which reads in full:

> "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly."

However, it has been repeatedly held that article I, section 12, and its predecessors (Ill. Const. 1870, art. II, sec. 19; Ill. Const. 1848, art XIII, sec. 12; Ill. Const. 1818, art. VIII, sec. 12) represent an ex-

pression of a philosophy rather than a mandate that a "certain remedy" be provided in any specific form. (*International Administrators, Inc. v. Life Insurance Co. of North America* (7th Cir. 1985), 753 F.2d 1373; *Sullivan v. Midlothian Park District* (1972), 51 Ill. 2d 274, 281 N.E.2d 659; *Costello v. Unarco Industries, Inc.* (1984), 129 Ill. App. 3d 736, 473 N.E.2d 96; *Koskela v. Martin* (1980), 91 Ill. App. 3d 568, 414 N.E.2d 1148, *rev'd* (1986), 111 Ill. 2d 476, 490 N.E.2d 675; *Adams v. City of Peoria* (1979), 77 Ill. App. 3d 683, 396 N.E.2d 572; *Berlin v. Nathan* (1978), 64 Ill. App. 3d 940, 381 N.E.2d 1367, *cert. denied* (1979), 444 U.S. 828, 62 L. Ed. 2d 36, 100 S. Ct. 53; *Pantone v. Demos* (1978), 59 Ill. App. 3d 328, 375 N.E.2d 480.) This is true even though the drafters saw fit to substitute the word "shall" in the present version for the word "ought" as used in previous versions. (*Adams v. City of Peoria* (1979), 77 Ill. App. 3d 683, 396 N.E.2d 572; *Berlin v. Nathan* (1978), 64 Ill. App. 3d 940, 381 N.E.2d 1367.) In light of the substantial State interest in uncovering child abuse or neglect and in protecting the children of this State, we find that the "good faith" immunity provided for mandated and permitted reporters under the Act is clearly justified and is in no way inconsistent with the Illinois Constitution.

■ Having decided that sections 5 and 9 withstand the plaintiffs' constitutional attack, we direct our attention to the plaintiffs' next argument: that the trial court erred in dismissing their action based upon the immunity granted under these provisions. Plaintiffs stress that the immunity granted under the Act is merely presumptive, giving them a right to overcome it by proof of a lack of good faith "determined in accordance with objective standards." They contend that the trial court's order of dismissal, which states that their cause of action was barred by affirmative defense, *i.e.*, the statutory immunity under the Act, somehow suggests that the court recognized an absolute immunity in favor of the defendants.

Plaintiffs are correct in asserting that the statute does not afford absolute immunity. Rather, "good faith immunity" is the rule. Pursuant to section 5, any authorized person who acts in good faith in the removal of a child shall be immune from liability. (Ill. Rev. Stat. 1983, ch. 23, par. 2055.) Further, section 9, in setting forth the grant of immunity under the Act, provides:

> "Any person, institution or agency, under this Act, participating in good faith in the making of a report, or in the investigation of such a report *** or in the retaining a child in temporary protective custody shall have immunity from any liability, civil, criminal or that otherwise might result by reason of such

actions. For the purpose of any proceedings, civil or criminal, *the good faith of any persons required to report, or permitted to report,* cases of suspected child abuse or neglect under this Act, *shall be presumed."* (Emphasis added.) Ill. Rev. Stat. 1983, ch. 23, par. 2059.

The first sentence of section 9 grants immunity to those persons acting under the Act, including those who retain temporary protective custody of a child, if they participated in good faith. The second sentence expressly states that the good faith of either required or permitted reporters "shall be presumed"; it does not mention the other categories of persons, such as those retaining custody. From the foregoing, it is apparent that good faith is only presumed as to "reporters" under the Act. While others authorized under the Act are still immune from suit if they participate in good faith, it does not appear that section 9 permits a presumption of good faith to arise beyond the reporting aspect of the statute.

Thus, the defendants here are statutorily presumed to have acted in good faith, and therefore immune from suit, when they reported a case of suspected child abuse or neglect. Any such presumption, however, is rebuttable. In Illinois, a rebuttable presumption creates a *prima facie* case of the particular issue involved. Here, that issue is the good faith of the defendants. It is then incumbent upon the party against whom the presumption operates to come forward with evidence sufficient to meet the presumption. (*Diederich v. Walters* (1976), 65 Ill. 2d 95, 357 N.E.2d 1128.) As such, Illinois recognizes the so-called "bursting bubble" theory regarding presumptions: once evidence is introduced contrary to the presumption, the bubble bursts and the presumption vanishes. (*Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 448 N.E.2d 872; McCormick, Evidence sec. 345, at 821 (2d ed. 1972).) The party intending to rebut the presumption must come forward with evidence " 'sufficient to support a finding of the nonexistence of the presumed fact.' " (95 Ill. 2d 452, 463, 448 N.E.2d 872, 877.) Should this be the case, the presumption would cease to operate, and the issue in dispute would be determined as if no presumption ever existed. (*Diederich v. Walters* (1976), 65 Ill. 2d 95, 357 N.E.2d 1128.) Only then, with the presumption met, would the burden here shift from the plaintiffs to the defendants. On the other hand, if no evidence is introduced to the contrary, then the *prima facie* case created under the presumption will prevail, and the defendants would be entitled to judgment as a matter of law.

In this vein, plaintiffs have simply failed to present anything

which would rebut the presumption of the specific point in issue: namely, the good faith of Dr. Stephens in making his report. Dr. Stephens' affidavit stated he believed "to a reasonable degree of medical certainty" that the boy may have been an abused or neglected child as described under the Act. Falling within the list of required reporters in section 4 (Ill. Rev. Stat. 1983, ch. 23, par. 2054), Dr. Stephens was acting pursuant to statute in making his report. As there is no indication that Dr. Stephens did not act in good faith, we find that the motion to dismiss those allegations relating to the report (counts I and II sounding in slander) was properly granted.

The remaining three counts against Dr. Stephens and Carle, as we view them, arise out of the fact that the boy was admitted to the hospital for two days, apparently against the parents' wishes. Dr. Stephens' notes from the physical examination indicate that he recommended the child be admitted to the hospital for observation of possible complications and due to a possible "abusive cause" of the fracture. According to Dr. Stephens, the boy's mother requested instead that a cast be placed on the leg so they could take him home, as the family could not afford hospitalization. Stephens states in his affidavit that he then conferred with Dr. Beck, the child's pediatrician, who agreed that the child be hospitalized and a report made to DCFS.

Plaintiffs' contentions in this regard focus on what they perceive as an improper act in taking temporary protective custody. They assert that Dr. Stephens and Carle retained the boy without a reasonable belief that allowing him to remain in the custody of his parents presented "an imminent danger to the child's life or health," as mandated under section 5. Therefore, plaintiffs stress, the defendants should not be allowed to benefit from statutory immunity.

However, we are not sure that Dr. Stephens and Carle ever took temporary protective custody of the child as contemplated by the Act. Rather, according to Dr. Stephens' affidavit, he acted upon his examination of the child, his discussions with the parents, and his "skill, training, and expertise as a physician" in deciding to admit the child to the hospital. We believe, from the sparse record before us, that the actions of these defendants were in accordance with accepted medical procedures as well as in the best interests of the child. The only action taken by the doctor and hospital was the admission of the child for health reasons. Taking as true all well-pleaded facts as well as all reasonable inferences therefrom for purposes of a motion to dismiss, we fail to observe a set of facts which would entitle the plaintiff to recovery. Accordingly, we find that the trial court did not err in granting defendants' motion to dismiss as to counts III through V.

Even assuming *arguendo* that Carle did take temporary protective custody of the child, we nevertheless conclude that the action would properly be dismissed based upon the immunity afforded under the Act. The twisting or spiral fracture evidenced here, which does not ordinarily result from a fall, coupled with an unsatisfactory explanation as to the cause of such a fracture, at least suggests the possibility of abuse or neglect. Dr. Stephens, in his report, also expressed concern as to the "rather light and unconcerned" attitude of the parents, noting the child's father became "quite defensive" about the possibility of abuse, even though "direct abuse" was not suggested. As we view the matter, Dr. Stephens' affidavit and report, taken together, infer a reasonable belief of an imminent danger to the child's health or life under the statute. Consequently, Dr. Stephens was acting as "authorized" under section 5, and both he and the hospital were entitled to "good faith" immunity. The affidavit further states that Matthew's case was reported to DCFS in good faith based upon Dr. Stephens' medical expertise, and we find nothing in the record to dispute this fact.

To the contrary, plaintiffs' affidavit, accompanied by progress reports from the hospital, suggests far less. Plaintiffs present nothing in the way of an opinion, medical or otherwise, to show that an examining physician in Dr. Stephens' position would not be justified in the actions he took. Plaintiffs also make varied "medical" references in their affidavit, without support, concerning the child's physical condition. Other statements in their affidavit as to the plaintiffs' love and concern for their child, while hopefully correct, are irrelevant to the precise inquiry presented. Moreover, alluding to hospital social worker comments and notes made after the fact, as well as the notes of the child's pediatrician to the effect that Matthew's injury may or may not have been accidental, is of little value. In sum, we hold that the cause was properly dismissed in all instances as to Dr. Stephens and Carle.

■■■ Plaintiffs next contend that the circuit court erred in ruling it lacked jurisdiction over their claim against defendants Kathy McDonald and DCFS. They also argue that the court erred in denying their oral motion to amend the complaint as to those defendants when the court ruled it also lacked jurisdiction to hear that motion.

Exclusive jurisdiction is granted to the Court of Claims under the Court of Claims Act (Ill. Rev. Stat. 1983, ch. 37, par. 439.1 *et seq.*) for all tort claims for damages against the State. (Ill. Rev. Stat. 1983, ch. 37, par. 439.8(d).) Thus, should the plaintiffs' claim be deemed one against the State, only the Court of Claims may entertain it.

From the record, DCFS was never served in this matter. Accordingly, only the propriety of the court's order as to defendant Kathy McDonald is in dispute.

It is well settled that the determination of whether an action is a suit against the State is dependent upon an analysis of two factors—the issues involved and the relief sought—rather than on the mere formal identification of the parties. (*Herget National Bank v. Kenney* (1985), 105 Ill. 2d 405, 408, 475 N.E.2d 863, 864.) If the relief sought could operate to control the actions of the State or subject it to liability, it will then be deemed an action against the State even though the State is not a specifically named party. (*Senn Park Nursing Center v. Miller* (1984), 104 Ill. 2d 169, 186, 470 N.E.2d 1029, 1038.) Moreover, legal official acts of State agents performed within the bounds of their official authority or duties are normally considered acts of the State itself. *Sass v. Kramer* (1978), 72 Ill. 2d 485, 381 N.E.2d 975.

There are no allegations here that defendant McDonald acted in any way other than pursuant to her duties as a child-protective worker for DCFS. Her affidavit states the procedures she followed in the course of her normal duties after being informed of a report of possible child abuse or neglect. She began an initial investigation on Saturday by speaking with Dr. Stephens and interviewing the plaintiffs that evening. On Sunday, she received a telephone call indicating the father was attempting to have Matthew released from the hospital. McDonald then properly contacted the State's Attorney's office about the situation and upon advice officially acted to take temporary protective custody of the child.

Plaintiffs, however, call this court's attention to *Hoffman v. Yack* (1978), 57 Ill. App. 3d 744, 373 N.E.2d 486, in which the plaintiff alleged that the defendant, his supervisor in a department at Southern Illinois University, engaged in a course of deliberate and malicious conduct while acting outside the scope of his employment duties. The *Hoffman* court concluded that the action could be maintained against the defendant in circuit court. Relying on *Hoffman*, plaintiffs assert on appeal that the trial court erred in refusing to allow them to file an amended complaint as to defendant McDonald. Apparently they believe they should be allowed to amend their complaint to include allegations of deliberate, malicious conduct not within the scope of defendant McDonald's duties.

Again, there is absolutely no indication that defendant McDonald ever acted maliciously or outside her responsibilities as an agent of DCFS. Plaintiffs' complaint contains no such allegations. Inasmuch as the decision of a trial court as to whether to permit

amendment to a complaint is a matter of judicial discretion, and considering that plaintiffs have presented nothing to indicate what facts their amended complaint would show, we opine that the circuit court did not abuse its discretion in refusing the plaintiffs' oral motion to amend. Merely attempting to allege malicious conduct so as to defeat a motion to dismiss is improper.

■■ Therefore, we hold that the trial court did not err in granting the defendants' motion to dismiss based upon lack of jurisdiction or in denying the plaintiffs' oral motion to amend. In any event, it would appear that defendant McDonald would also be immune from suit under sections 5 and 9 of the Act.

■■ Finally, plaintiffs raise one last argument: that their motion for default as to defendant McDonald should have been granted because she failed to file any responsive pleadings within 30 days of the time she was served with summons.

Defendant McDonald was served on June 11, 1985. On July 18, 1985, a motion for extension of time in which to answer or otherwise plead pursuant to section 2—1007 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1007) was filed in her behalf. That motion, as well as the affidavit of Daniel A. Baechle, regional counsel for the Champaign DCFS office, stated that the summons and complaint served on McDonald were inadvertently mislaid while Baechle was out of the office for an extended period of time. As a consequence, the summons and complaint were not immediately forwarded to the director of DCFS, and later to the Illinois Attorney General's office, for representation and indemnification.

On July 26, 1985, plaintiffs filed their motion for default. The circuit court, on August 13, 1985, granted the motion for an extension of time and denied plaintiffs' motion for default. As we find nothing wrong with the trial court's action here, we refuse to overrule its decision.

In sum, our conclusions here are inescapable, should the Act be given the force and effect intended by the legislature. Accordingly, from the foregoing, we hold that the judgment of the circuit court of Champaign County is affirmed.

Affirmed.

McCULLOUGH, P.J., and WEBBER, J., concur.