HUDOCK, Judge:
 

 Appellants appeal from the order of the trial court granting the preliminary objections, in the nature of a demurrer, of Appellees in an action brought as a result of the conduct of Appellees in reporting suspected child abuse to the proper authorities after a child was presented to them at the hospital emergency room for treatment. We affirm.
 

 The facts, as summarized from Appellants’ second amended complaint, are as follows: On or about September 25, 1991, Molly Heinrich (Molly), born February 17, 1991, was involved in an accident whereby her walker tipped over, causing her to strike the back of her head on the kitchen floor. On September 27, 1991, Appellant Jean Heinrich (Mother) noticed Molly was experiencing some discomfort associated in and around the area of her ears and scheduled an appointment with Dr. Romuald Caroff at 3:45 p.m. At approximately 5:15 p.m., Dr. Caroff examined Molly, diagnosed her as possibly beginning an ear infection, and prescribed an antibiotic, Amoxycillin. At approximately 10:30 a.m., on Saturday, September 28, 1991, Mother noticed swelling on and around Molly’s left temple, ear and eye. Because the swelling persisted, at approximately 11:30 a.m., on that same day, Mother and Appellants Robert and Mary Heinrich (Grandparents) brought Molly to the emergency room of Appellee Conemaugh Valley Memorial Hospital (Hospital). The hospital staff gathered the necessary insurance information and medical history, and, at approximately 12:15 p.m., Appellants were taken to an examining room in the emergency room at which time an emergency room nurse reviewed the information on the chart. Molly’s “injury” was classified by the triage coordinator as “non-urgent.” At approximately 12:30 p.m., Appellee Andrew George, M.D., examined Molly and then left. At approximately 12:45 p.m., Dr. George returned with Appellee Loretta Opila, M.D., who also examined Molly, and then both doctors left. According to the complaint, “Dr. George and Dr. Opila observed a non-life threatening swelling on the left side of the
 
 *468
 
 child’s head that exhibited no scrapes or abrasions of the skin and arbitrarily concluded that the child suffered a hematoma or bruises to that area of the child’s head without consulting a pediatrician and improperly rejecting the available medical history; that [Molly] was involved in the walker accident of September 25, 1991.” Appellants’ Second Amended Complaint, 8/18/93, at ¶22.
 

 At approximately 12:50 p.m., Dr. Opila returned and asked Mother to consent to x-rays of Molly’s head and Mother consented. Appellants remained in the examining room while a nurse entered the room, looked at Molly’s swelling, and left without comment. Without any type of treatment being administered in the meantime, at approximately 2:00 p.m., Molly was taken for x-rays and was brought back to the emergency room at approximately 2:45 p.m. During this time, Mother and Grandparents were moved to another examining room which was farthest from the emergency room desk. From that distance, they could clearly hear a number of nurses at the emergency room desk loudly discussing Molly’s condition and treatment and the allegations of abuse and neglect in front of a busy emergency department waiting room. Appellant Robert J. Heinrich, Sr. (Grandfather) observed Drs. Opila and George reviewing x-rays of Molly. The x-rays were of Molly’s entire body and were not limited to x-rays of the child’s head to which Mother consented.
 

 At approximately 3:00 p.m., Dr. George told Mother that the x-rays were negative and that he would attempt to contact Dr. Caroff to confirm the results of his examination of Molly on September 27, 1991. . Shortly thereafter, Dr. Opila returned and once again began questioning Mother and Grandparents as to the source of Molly’s injury. During this questioning, Dr: Opila opined that the swelling observed was most consistent with having had a blow in that area of the head. At approximately 3:30 p.m., Mother and Grandparents were introduced to Appellee Pat Stock, who identified herself as an employee of Appellee Hospital’s Department of Social Services. Ms. Stock stated that she had been contacted by Dr. Opila and asked to ascertain how Molly was injured or the
 
 *469
 
 source or cause of the swelling. Ms. Stock questioned Mother and Grandparents for approximately twenty minutes. During this time, Dr. George informed Mother and Grandparents that he had spoken with Dr. Caroff, who reported that there had been no swelling on Molly’s head when he examined her the day before. Mother responded angrily that she had told him earlier that she had not noticed any swelling prior to 10:30 a.m. on September 28, 1991.
 

 Ms. Stock left and returned shortly thereafter to inform Mother and Grandparents that the physicians wanted to admit Molly in order to observe the head injury for twenty-four hours. Shortly thereafter, she again began to question Mother and Grandparents. Dr. George entered and informed Mother that he wanted to admit Molly for observation. Mother responded that she wanted Dr. Caroff to examine Molly, or, in the alternative, wanted to take Molly to another hospital since the child had not received any treatment for her swelling since arrival. Grandfather had been taking turns walking Molly in the hall in an effort to quiet her. When he attempted to walk into the waiting room with Molly, one of two security guards stepped forward and directed him to return to the examining room. He was further told that all members of his family had to remain in the assigned examining room.
 

 At approximately 4:00 p.m., a nurse administered a dose of Amoxycillin, the antibiotic prescribed by Dr. Caroff. This was the first visible sign of treatment which Mother and Grandparents observed. At this time, Mother noticed that Molly’s swelling had subsided. At approximately 4:45 p.m., Appellees Elisabeth Cole, M.D., and Edward Devellen, M.D., entered the examining room and introduced themselves as family practitioners. They then proceeded to examine Molly. During this time, Dr. Devellen cleaned Molly’s ears and observed that her eardrums were slightly red and stated that the swelling was not consistent with a blow to the head since there was no bruising. Mother spoke with an Eileen Stouffer by telephone, who introduced herself as a representative of Cambria County Children and Youth Services (CYS). She informed Mother that if she did not admit Molly, CYS would come to Appellee
 
 *470
 
 Hospital and take custody of the child. Mother informed Ms. Stouffer that she had never refused to admit the child, but had only objected to the fact that the child was not receiving any treatment for the swelling.'
 

 Dr. Opila reentered and began to question Mother and Grandparents concerning other possible causes for Molly’s swelling. Throughout the time Appellants were in the emergency room, “various unidentified nurses, residents, doctors and other hospital employees, representatives and agents, entered the emergency room examining room without notice or introduction and without any cause such as examination, diagnosis, treatment or consultation, and left without further comment, creating an uneasy atmosphere for [Appellants] in which they felt they were ‘on display’ and treated with extreme suspicion.” Appellants’ Second Amended Complaint, 8/18/93, at ¶ 41.
 

 At approximately 5:30 p.m., Mother went to admissions and completed the necessary paperwork. During this time, blood samples were taken from Molly. The nurse informed Mother that the swelling had been diagnosed by Dr. Devellen as Cellulitis, an infection of the soft tissue. This diagnosis had not been conveyed to Mother prior to this time. Mother and Molly were taken to a hospital room and Molly was started on an i.v. of Nafcillin, a strong antibiotic. Mother was informed that the emergency room doctors had prescribed Similac as a nutritional supplement. However, Mother told a nurse that Molly was allergic to Similac and stated that no emergency room personnel had inquired as to any allergies that Molly may have. At approximately 8:00 p.m., Ms. Stouffer visited Mother in Molly’s hospital room and explained that she was being investigated for suspected child abuse and then questioned Mother for approximately thirty minutes. Mother signed a medical records release form for CYS to review the medical records.
 

 On September 29, 1991, Dr. Richard Green, who was covering for Dr. Caroff, examined Molly. He stated that the doctors had diagnosed the swelling as Cellulitis from an inner ear infection. On Monday, September 30, 1991, Dr. Caroff
 
 *471
 
 examined Molly at approximately 1:45 p.m. At this time, he informed Mother that he had already contacted CYS in an attempt to resolve any misunderstanding and to correct any misinformation. On October 1, 1991, at approximately 9:00 a.m., Dr. Caroff examined Molly. Dr. Caroff stated that he requested a pediatrician be consulted when he was contacted by the emergency room staff on September 28, 1991, but they failed to follow-up on his request. Dr. Caroff further stated that Dr. Joseph Sheridan of Johnstown Pediatrics Association would examine Molly later that day. At approximately 10:00 a.m., a pediatric resident of Johnstown Pediatrics Association examined Molly and reviewed the medical case history with Mother.
 

 At approximately 5:00 p.m. on October 1, 1991, Dr. Sheridan and two of his associates examined Molly and further questioned Mother and Grandparents. Dr. Sheridan stated that the fall on her head was the cause of the swelling and diagnosed the child’s condition as a sub-aponeourosis hematoma, caused by a broken blood vessel caused by the fall in the walker. At this time, he directed the i.v. be discontinued since Molly was not suffering from an infection. He notified Mother that he was contacting Dr. Caroff concerning Molly’s discharge from Appellee Hospital. At 5:30 p.m., Ms. Clarice Ott, a social worker, spoke with Mother and informed her that she was still under investigation for suspected child abuse. At approximately 6:00 p.m., Molly was discharged from Appellee Hospital by authorization of Dr. Caroff. On Thursday, October 3, 1991, Mother was informed by Ms. Stouffer that the report of suspected child abuse was held to be unfounded and promised to destroy the paperwork as soon as possible.
 

 Based upon the above events, Appellants, in their complaint, asserted that they, as well as Mother’s siblings, have been confronted by friends, family members, neighbors, and acquaintances who had independently learned of the above incident and the investigation of suspected child abuse. Appellants also asserted that they have suffered from such physical manifestations of the stress resulting from the above incident including, but not limited to, severe tension head
 
 *472
 
 aches, pain and stiffness, fatigue, anxiety, loss of sleep, loss of appetite, nausea, shortness of breath, upset digestive processes, irritability, and shortness of temper. Finally, Appellants asserted that the actions of Appellee Hospital, “by and through its employees, representatives and agents, and all individual [Appellees], individually and collectively, during the course of treatment of [Molly] and during their dealings and conversations with [them] were insulting, outrageous, malicious, intentional, willful, wanton, reckless, vexatious and taken in bad faith and with bad motive, due to their preconceived suspicions, biases and prejudice based on [their] economic situation, by their refusal to investigate the information provided by [them] and the delay in treating [Molly] and were with a reckless indifference to the rights of all [Appellants] and for the purpose to oppress [Appellants], with the knowledge that such actions would cause [Appellants] to suffer physical manifestations of the injuries that they suffered.” Appellants’ Second Amended Complaint, 8/18/93, ¶ 56.
 

 As a result, Appellants filed a four count complaint in which they alleged causes of action against Appellee Hospital for corporate negligence and defamation, and causes of action for intentional and negligent infliction of emotional distress against all Appellees. Appellees filed preliminary objections, in which they raised, among other things, immunity from suit under section 6318 of the Child Protective Services Law (the Law), 23 Pa.C.S. § 6301,
 
 et seq.
 
 After hearing argument, the trial court issued an order in which it: 1) upon the representation of Appellants’ counsel, dismissed Appellees Dr. Cole, Dr. Devellen, and Clarice Ott from the lawsuit because they executed their duties in good faith, and because Appellants’ second amended complaint failed to provide specific material facts which would indicate bad faith in order to overcome the statutory presumption of good faith; 2) dismissed Appellants’ claim of corporate negligence on the basis that the facts alleged in the second complaint were insufficient to constitute a breach of duty, a legal injury, or legal causation; 3) allowed Appellants twenty days to plead more specifically their defamation claim; 4) dismissed Appellants’ claim for intentional
 
 *473
 
 and negligent infliction of emotional distress for failing to state facts that would support extreme and outrageous conduct which rose to and beyond all bounds of decency and for failing to set forth evidence of any physical or bodily injury; 5) dismissed Appellants’ claims for punitive damages for failing to state facts that show outrageous behavior on the part of Appellees; and 6) dismissed as defendants Appellee Hospital and Appellees Dr. Opila, Dr. George and Pat Stock under the protection of immunity.
 

 Appellants raise the following issue on appeal:
 

 WHETHER THE TRIAL COURT ABUSED ITS DISCRETION OR COMMITTED AN ERROR OF LAW IN GRANTING [APPELLEES’] PRELIMINARY OBJECTIONS TO [APPELLANTS’] SECOND AMENDED COMPLAINT?
 

 Appellants’ Brief at p. 4.
 

 The order at issue allowed Appellants twenty days to amend their complaint as to their defamation claim, and, ordinarily, an issue of appealability would arise. However, we note that the same order dismissed all Appellees from the lawsuit. The net effect of the order, then, was the dismissal of the entire case. When the grant of preliminary objections results in the dismissal of a cause of action, a court should sustain the objections only in cases that are clear and free from doubt.
 
 Meinhart v. Heaster,
 
 424 Pa.Super. 433, 622 A.2d 1380 (1993). Our review is plenary; “[w]e must determine if the trial court correctly determined that, taking as true all properly pleaded material facts and disregarding all pleaded conclusions of law, under no circumstances will the law permit recovery on the complaint.”
 
 Pysh v. Security Pacific Housing Service,
 
 416 Pa.Super. 64, 69, 610 A.2d 973, 975 (1992),
 
 alloc. den.,
 
 533 Pa. 625, 620 A.2d 491 (1993).
 

 In general, preliminary objections are not available to raise the defense of immunity from suit.
 
 Kyle v. McNamara & Criste,
 
 506 Pa. 631, 487 A.2d 814 (1985). Where a party erroneously asserts substantive defenses in preliminary objections rather than raising same by answer or in new
 
 *474
 
 matter, the failure of the opposing party to file preliminary objections to defective preliminary objections, raising erroneous defenses, waives the procedural defect and allows the trial court to rule on the preliminary objections.
 
 Preiser v. Rosenzweig,
 
 418 Pa.Super. 341, 614 A.2d 303 (1992),
 
 allocatur granted,
 
 535 Pa. 637, 631 A.2d 1009 (1993). Commonwealth Court has also overlooked the irregularity when opposing counsel fails to object, as well as where the defense of immunity is clear on the face of the pleadings.
 
 See generally, Swartz v. Masloff,
 
 62 Pa.Cmwlth. 522, 437 A.2d 472 (1981). Commonwealth Court has also considered the defense of immunity raised by way of preliminary objections in the interests of judicial economy where the plaintiff did not object to the procedural defect.
 
 See Nicholson v. M & S Detective Agency, Inc.,
 
 94 Pa.Cmwlth. 521, 503 A.2d 1106 (1986).
 

 As this Court has noted, the purpose of the Law “is to bring about quick and effective reporting of suspected child abuse so as to serve as a means for providing protective services competently and to prevent further abuse of the children while providing rehabilitative services for them and the parents.”
 
 In Interest of J.R.W.,
 
 428 Pa.Super. 597, 602, 631 A.2d 1019, 1021 (1993). To this end, the Law requires, under threat of criminal penalty,
 
 [1]
 
 that health care professionals and others report suspected abuse:
 

 § 6311. Persons required to report suspected child abuse
 

 (a) General Rule. — Persons who, -in the course of their employment, occupation or practice of their profession, come into contact with children shall report or cause a report to be made in accordance with section 6313 (relating to reporting procedure) when they
 
 have reason to believe,
 
 on the basis of their medical, professional or other training and experience, that a child coming before them in their professional or official capacity is an abused child. The
 
 *475
 
 privileged communication between any professional person required to report and the patient or client of that person shall not apply to situations involving child abuse and shall not constitute grounds for failure to report as required by this chapter.
 

 (b) Enumeration of persons required to report. — Persons required to report under subsection (a) include, but are not limited to, any licensed physician, osteopath, medical examiner, coroner, funeral director, dentist, optometrist, chiropractor, podiatrist, intern, registered nurse, licensed practical nurse, hospital personnel engaged in the admission, examination, care or treatment of persons, a Christian Science practitioner, school administrator, school teacher, school nurse, social services worker, day-care center worker or any other child-care or foster-care worker, mental health professional, peace officer or law enforcement official.
 

 23 Pa.C.S. § 6311(a) and (b) (emphasis added). Immunity is clearly provided to those who report under the Law:
 

 § 6318. Immunity from liability
 

 (a) General rule. — A person, hospital, institution, school, facility or agency participating in good faith in the making of a report, cooperating with an investigation or testifying in a proceeding arising out of an instance of suspected child abuse, the taking of photographs or the removal or keeping of a child pursuant to section 6315 (relating to taking child into protective custody) shall have immunity from any civil or criminal liability that might otherwise result by reason of those actions.
 

 (b) Presumption of good faith. — For the purpose of any civil or criminal proceeding, the good faith of a person required to report pursuant to section 6311 (relating to persons required to report suspected child abuse) shall be presumed.
 

 23 Pa.C.S. § 6318. There is no dispute that all Appellees fall within the protection provided under the Law. Appellants were afforded three opportunities to amend their complaint so as to assert sufficient specific facts tending to show that the
 
 *476
 
 Appellees acted in bad faith and thus overcome the statutory presumption. The trial court concluded that Appellants had failed to do so on each occasion. We agree.
 

 Appellants argue that Appellees’ preliminary objections should not have been granted because the question of whether Appellees acted in good faith is a question of fact for the jury, and their complaint makes sufficient, specific allegations of bad faith. We cannot agree. A review of Appellants’ second amended complaint reveals that it contains general language with regard to the motives of the individual Appellees and allegations of maliciousness. Such allegations are insufficient to overcome the statutory presumption.
 
 See Roman v. Appleby,
 
 558 F.Supp. 449 (E.D.Pa.1983) (good faith of defendant must be judged against an objective standard rather than alleged motives or allegations of maliciousness), cited with approval in
 
 Brozovich v. Circle C Group Homes, Inc.,
 
 120 Pa.Cmwlth. 417, 548 A.2d 698 (1988). Moreover, with regard to Appellants’ claim that the Appellees failed to investigate the true source of Molly’s injury, we adopt as sound the rationale of our sister court:
 

 However, the Law
 
 requires
 
 the Circle C Appellees to immediately report
 
 suspected
 
 abuse. The urgency of prompt reporting is stressed throughout the Law’s provisions.... To adopt Appellants’ position that these Appellees were somehow required to verify Landino’s allegations of abuse prior to reporting them runs contrary to the express purpose of of [sic] the Law____ The [Law] does not envision any pre-reporting investigation, and, in light of the mandatory reporting procedure and the Law’s presumption of good faith, we are unwilling to presume that the failure to conduct such an investigation was in bad faith.
 

 Brozovich,
 
 at 421, 548 A.2d at 700 (emphasis in original) (footnote omitted).
 

 Appellants cite to
 
 Brown v. Delaware Valley Transplant Program,
 
 420 Pa.Super. 84, 615 A.2d 1379 (1992)
 
 (en banc), alloc. den.,
 
 535 Pa. 652, 634 A.2d 216 (1993), to support their proposition that the issue of good faith is a question of fact to be determined by the factfinder. In
 
 Brown,
 
 this Court was
 
 *477
 
 presented with the issue of whether the appellee hospital acted in good faith in harvesting the decedent’s bodily organs pursuant to the Uniform Anatomical Gift Act (the Act), 20 Pa.C.S. §§ 8601-8607. Although the Act does not contain a presumption of good faith, it does provide a specific standard of conduct to be followed before the organs are taken. Citing with approval a New York decision, this Court concluded that good faith may be determined as a matter of law when the statute involved provides specific criteria regarding a standard of conduct by which the defendants’ conduct can be measured. Thus, this Court, finding that the appellee hospital acted in good faith as a matter of law, affirmed the entry of summary judgment. The good faith provision of the Act was once again at issue in
 
 Callsen v. Cheltenham York Nursing Home,
 
 154 Pa.Cmwlth. 541, 624 A.2d 663 (1993), wherein Commonwealth Court was presented with the issue of whether preliminary objections were properly sustained, on the basis of immunity, with regard to the appellees action in transporting the decedent’s body to Temple University for the purpose of dissection. Because the averments of the complaint did not assert what efforts were expended by the appellees in their effort to locate the decedent’s next of kin, Commonwealth Court could not find good faith as a matter of law, and remanded the case for further proceedings.
 

 As noted above, the Law, unlike the Act, provides a presumption of good faith. In addition, while, like the Act, the Law provides specific criteria regarding a standard by which Appellees conduct can be measured, the Law provides a specific reporting procedure which leaves little question as to whether the procedure was followed. The Act, on the other hand, provides a procedure whereby the medical person or agency must make a good faith effort to contact the decedent’s next of kin; the quality of the effort made to contact relatives is more susceptible to a jury question. We find that the Law requires an exercise of good faith which is different in kind from that required under the Act. Thus, immunity can be found in the present case as a matter of law.
 

 
 *478
 
 Decisions of our sister states have also dismissed similar complaints on the basis that no showing was made by the plaintiff which would overcome the statutory presumption of good faith.
 
 See e.g., Lehman v. Stephens,
 
 148 Ill.App.3d 538, 101 Ill.Dec. 736, 499 N.E.2d 103 (1986),
 
 app. den.,
 
 113 Ill.2d 576, 106 Ill.Dec. 48, 505 N.E.2d 354 (complaint against reporting physician properly dismissed wherein suspicious nature of child’s “twisting type” fracture and cavalier attitude of parents gave physician reasonable cause to believe child was abused and parents failed to present anything which would rebut statutory presumption);
 
 Kempster v. Child Protective Services,
 
 130 A.D.2d 623, 515 N.Y.S.2d 807 (1987) (summary judgment properly granted in favor of hospital where nurse had reasonable cause to suspect that infant presented to emergency room with swelling of her nose, allegedly as a result of a fall two days earlier, and, as revealed by subsequent x-rays, a healed fracture of her right wrist, for which the mother could provide no explanation, might have been abused; good faith of reporter is presumed, qualified immunity is not predicated upon actual or conclusive proof of abuse or maltreatment, and mother offered no evidence to rebut statutory presumption);
 
 Awkerman v. Tri-County Orthopedic Group, P.C.,
 
 143 Mich.App. 722, 373 N.W.2d 204 (1985) (summary judgment properly granted; allegations of negligent diagnosis of cause of minor’s frequent bone fractures not sufficient, as a matter of law, to overcome statutory presumption of good faith, and immunity provision precludes recovery for consequential damages such as shame and humiliation);
 
 Gross v. Haight,
 
 496 So.2d 1225 (1986) (summary judgment properly entered in a defamation case wherein parents failed to set forth specific facts showing there was a genuine issue of the hospital officials’ lack of good faith in reporting suspected child abuse or of publication to anyone who was not privileged to receive the information).
 
 See also Thomas v. Beth Israel Hospital,
 
 710 F.Supp. 935 (S.D.N.Y.1989) (federal court, applying New York law, dismissed with prejudice complaint against hospital where plaintiffs allegations of fraudulent reporting of child abuse was factually incorrect and insufficient
 
 *479
 
 to rebut the statutory presumption that hospital acted in good faith).
 

 In
 
 Brozovich, supra,
 
 Landino, who was then nineteen years old, alleged that she was the victim of child abuse when, as a minor, she was in the care of the Brozoviches, her foster parents. As quoted above, Commonwealth Court held that the Circle C Appellees were not required to investigate Landino’s claims before reporting them. In the present case, the alleged victim of child abuse was an infant. Thus, Molly could not confirm the source of her injury. For much the same reasons, we are unpersuaded by Appellants’ attempt to assert bad faith because Molly’s injury was minor and did not fall under the statutory definition of child abuse. Molly, a seven-month-old infant, was presented at Appellee Hospital’s emergency room with swelling of unknown origin.
 
 [2]
 
 We cannot fault Appellees, given the criminal penalty imposed for failing to report suspected child abuse, from making a report under these circumstances.
 

 As our review of Appellants’ complaint reveals that each count stated therein is based on the conduct of Appellees, leading to the reporting of suspected abuse, we find that the immunity provided under the Law applies to all of them.
 

 Order affirmed.
 

 [1]
 

 . "A person or official required by this chapter to report a case of suspected child abuse who willfully fails to do so commits a summary offense for the first violation and a misdemeanor of the third degree for a second or subsequent violation.” 23 Pa.C.S. § 6319.
 

 [2]
 

 . Indeed, we find Appellants’ argument contradictory. Appellants claim that the several Appellees did not provide treatment promptly to alleviate Molly’s suffering, yet at the same time argue the lack of severity of Molly's swelling did not afford the several Appellees reason to believe that she was subject to child abuse.